IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

VIVIANNE JADE WASHINGTON,

Plaintiff, CIVIL ACTION FILE NO. 3:18-cv-00086-TCB

vs.

INVESTIGATOR JASON DURAND, et al.,

Defendant.

DEPOSITION OF
JASON DURAND

MAY 21, 2019
12:16 p.m.
Meriwether County 911 Center
619 County Farm Road
Greenville, Georgia 30222

Jenna Rose Johnson, CVR, CCR
Certificate No.: 5818-4261-2151-9104



A P P E A R A N C E S

FOR THE PLAINTIFF:

Jeffrey R. Filipovits
Filipovits Law
2900 Chamblee Tucker Road, Building 1
Atlanta, Georgia 30341
Phone: (678)237-9302
E-mail: jrfilipovits@gmail.com

Jennifer Hickey
Law Office of Jennifer Hickey
1310 Rockbridge Road SW, Suite G2
Stone Mountain, Georgia 30087
Phone: (770)674-8252
E-mail: Jennifer@jenniferhickeylaw.com

FOR THE DEFENDANT:

Taylor Hensel
Buckley Christopher
2970 Clairmont Road NE, Suite 650
Atlanta, Georgia 30329
Phone: (404)633-9230
Fax: (404)633-9640
E-mail: thensel@bchlawpc.com

ALSO PRESENT:

HUGH HOWARD



I N D E X

WITNESS: PAGE
MR. JASON DURAND....................................4

E X A M I N A T I O N PAGE
EXAMINATION by MS. JENNIFER HICKEY..................4

I N D E X T O E X H I B I T S
PLAINTIFF'S EXHIBITS DESCRIPTION PAGE
EXHIBIT NO. 3 POLIC NARRATIVE 15

(ALL EXHIBITS ATTACHED TO DEPOSITION TRANSCRIPT.)

(In the following transcript, dashes [--] are used to indicate an intentional interruption of a sentence and ellipsis [...] is used to indicate an unfinished sentence in dialogue or written material.)



(The Reporter's Disclosure was presented and is attached.)

The following proceedings began at 12:16 p.m.:

P R O C E E D I N G S

MS. HICKEY: Can you swear in the witness?

JASON DURAND,

having been previously sworn, testified as follows:

MS. HICKEY: This is the deposition of Jason Durand taken in the case of Washington v. Durand, Number 3:18-cv-00086-TCB. The deposition is taken pursuant to notice and agreement. I'm proposing we reserve all objections, except as to the form of the question. Will you be reading and signing?

MR. HENSEL: Same stipulations, and we will be reading and signing.

E X A M I N A T I O N

BY MS. JENNIFER HICKEY:

**Q Before we get started, just a few things to go over: If you could, make sure all of your answers are verbal. So if it is a yes-or-no question, say yes or no, instead of nodding or shaking your head. Other than that, if you need a break, please, feel free to let me know. Just answer whatever question is on the table, and then we are happy to take a break for you.**

Page 5

A Okay.
Q Have you given a deposition before?
A No, ma'am.
Q We're just going to start with some background information. I understand that you have a degree from Mercer University; is that correct?
A That's correct.
Q When did you receive that?
A '97.
Q Once you graduated, did you start working in law enforcement right away?
A I did.
Q Where did you work?
A Troup County Sheriff's Office.
Q How long were you with Troup County?
A A little over two years.
Q What was your rank there?
A Patrol deputy, canine patrol.
Q Why did you leave Troup County?
A Change of careers.
Q So you resigned voluntarily?
A Yes.
Q Where did you go after that?
A Newman Construction Company.
Q So you left law enforcement altogether at that point?

Page 6

A Yes.
Q And why did you do that?
A Just a career change. Just politics at the sheriff's office.
Q So from there you went into construction?
A Yes.
Q How long did you do that?
A Eight years with two different companies.
Q Where did you go after that?
A Back into law enforcement.
Q Why did you decide to go back to law enforcement?
A I don't know. I just did. I don't know.
Q Where did you go?
A Meriwether.
Q When was that that you started in Meriwether?
A 2012.
Q What was your rank when you started there?
A Patrol.
Q What were your job duties and responsibilities generally?
A Patrolling the county roads and Georgia state roads of Meriwether County and answering calls.

Page 7

Q How long did you do that before you were promoted?
A A year. I think I was promoted to Corporal. After year and a half, I went into investigations maybe.
Q Another year and a half after you were promoted. Do you know when you started with investigations?
A I couldn't tell you.
Q Can you tell me about some of your job duties with the investigations department?
A I investigated all crimes. I was in charge of the sex offender registry. That is really about it.
Q And you don't have a sense of how long you were with the investigative unit total?
A A year and a half.
Q And during that time, Lieutenant Howard was your immediate supervisor?
A Yes.
Q Did you have any other supervisors that you reported to?
A When I first started -- I can't remember his rank -- it was Scott -- I can't remember his last name. Maybe he was a captain. His last name is on the tip of my tongue.

Page 8

Q And you said that was when you first started?
A Yes. And he left the sheriff's office voluntarily thereafter.
Q What types of crimes did you investigate in your time there?
A Everything from misdemeanor theft to homicide to child molestations.
Q We're obviously here to discuss the arrest of Vivianne Washington in connection to what was ultimately the murder of Dorothy Dow. Was that your first murder investigation?
A No.
Q How many murders had you investigated prior to that?
A Two -- three.
Q Could you tell me a little bit about your role in those investigations?
A One of them I was just a -- I just helped. I wasn't a lead investigator on it. Two of them I helped. And then two prior to that, I was a lead investigator.
Q How do you become the lead investigator?
A You are the one called out. You are the

first one there.

Q Who makes the decision?

A We were on an on-call schedule, and I was on-call that day that it happened.

Q So if you are the investigator that was on call you would become the lead investigator at that point?

A Yes, ma'am.

Q Are you supervising other people during the investigation if you are the lead?

A Maybe at first, but not through the whole thing.

Q Were you a supervisor to anyone throughout your time at Meriwether County? Did you have anyone who reported to you?

A I was a Corporal on patrol, so I had people underneath me. But unless I was the officer in charge, no.

Q And once you were in the investigative unit, you didn't have any direct subordinates?

A No.

Q When did you leave Meriwether County Sheriff's office?

A Three years ago.

Q Why?



A It was just time for a career change.

Q What did you do after that?

A I am back in construction.

Q And that is what you are doing now?

A Yes.

Q Do you recall if you conducted any investigations after the Dow investigation after you left Meriwether County?

A I don't.

Q Were you disciplined for your role in the Vivianne Washington investigation in anyway? The Dow investigation.

A No.

Q I think we will just go ahead and start walking through the events of the investigation. Tell me about how you first became involved.

A I was called by the deputies that arrived on scene.

Q And this was August 4, 2016, when the crime was committed?

A Yes, ma'am.

Q So the deputies called you. And you were the investigator that was on call, and that is why you got the call?

A That's correct.



Q What did you do after you received the call?

A I responded to the scene. In route I called Lieutenant Howard. I got on scene and secured everything there. That is pretty much it.

Q What does it mean when you say you secured the scene?

A I just kind of told everybody to stay out of the house to preserve. Ms. Dow had already been transported to the hospital.

Q Was she there when you arrived?

A No. She had already been transported. I worked with Lieutenant Howard about calling the GBI Crime Scene to come out to process. Once we got everything settled on scene, I went to the hospital for an interview of Ms. Dow.

Q Do you remember about how long you had been at the scene or when that was?

A No.

Q Before you went to the hospital to speak with Ms. Dow, did you speak with anyone else at the scene?

A No.

Q While you were at the hospital, you went into meet Ms. Down. Did you meet anyone else?

A I wasn't there to meet people. Her family



was there.

Q Did you speak to them?

A Nothing, besides sorry for what happened. And I needed to speak with her.

Q When you went in to speak with Ms. Dow, can you describe her physical and mental state at that point?

A She was very alert. She was coherent. She was in a lot of pain. My interview with her did not last long. It was very basic questions.

Q Do you recall what you asked her?

A No, ma'am.

Q Do you recall anything she told you about the suspects at that point?

A No, ma'am.

Q So you go in to speak with Ms. Dow briefly because of her condition. And you don't remember anything that she said to you at all?

A No. It was three years ago.

Q We understand that she may have told you a little bit about what she heard or what she saw in the house. Do you remember if she said she saw anybody firsthand?

A I don't believe she said she recognized anybody. I would have to say no to that.

Q So you felt that you came out of the interview with no information to go on?
A As far as a positive identification, no.
Q Did you have anything that you wanted to investigate further that you remember from speaking with her?
A She said that there were male and female voices. All of the lights were off. She couldn't see them.
Q So she didn't identify them whether they were black or white?
A No.
Q What did you do after you left the hospital?
A I came back to -- I'm not sure if I went back to the scene or went to the sheriff's office.
Q Why would you have gone to the sheriff's office at that point?
A I don't know.
Q Do you mean you thought maybe you were done?
A No. The scene was secured. We had patrol deputies at the scene. I think we were waiting on the GBI Crime Scene to come in. I think I went back to the sheriff's office and met with Lieutenant Howard.
Q What did you talk about with Lieutenant Howard when you got there?



A I have no idea.
Q Assuming you went back and talked with Lieutenant Howard about the investigation, what do you remember about additional steps you took after the scene was processed to investigate?
A I am not following your question.
Q You go back to the office and have a conversation with Lieutenant Howard. What do you do next?
A That was pretty late into -- it was well after midnight. I think the crime scene was coming first thing in the morning right at daylight. I think we just went back to the scene and waited on them.
Q So you did go back to the scene. Did you talk with anyone else then at the scene, besides law enforcement?
A No, ma'am.
Q So you are at the scene, and it is secured. It is pretty late at night/early in the morning the day following the crime. Do you remember where you went next?
A After the scene was processed?
Q Right.
A I probably went home and went to bed.
Q The scene is processed. You have to sleep



sometime. Totally understandable. What happened after that? When is the next time you were on shift?
A I believe we came back later that day. When I went home, I didn't say that long. It was just a couple of hours, and I came back. To be honest with you, I don't know.
Q I'll ask you some more specific questions then. We will start drilling down a little more. Did you speak with Office McPhie from the Newnan Police Department at some point during this investigation?
A I can't recall.
Q Did you learn, from the Newnan Police Department, information from an confidential informant about this case?
A Me and Lieutenant Howard were talking about the case. I cannot recall if it was directly shared to me or if Lieutenant Howard advised me of the information.
Q What do you remember you learning?
A I don't know. I can't tell you. I mean I don't remember. It has been three years ago.
(Plaintiff's Exhibit No. 3 marked for identification.)
Q (MS. HICKEY) Absolutely. Let me show you something that might help. I'll go ahead and



introduce this into evidence. This will be Number 3. What I'm going to be showing you is a written narrative received from McPhie with the Newnan Police Department. In particular, he mentions that on August 5, 2016, he was put in contact with you. It is the first two paragraphs if you want to look really quick.
A Okay.
Q Based on that, McPhie mentions in there that he was put in contact with you. Did he e-mail you, call you? How did you communicate with McPhie about this confidential informant?
A I would assume by phone or text message.
Q Specifically, what information did McPhie pass to you?
A Information about a Sanquavious Cameron.
Q What did he tell you about Mr. Cameron?
A This was actually involving -- it all kind of took place at the same time -- but this was an incident prior to the home invasion.
Q What was that incident?
A Ms. Dow's pocketbook was stolen.
Q What did he tell you about that crime?
A He didn't tell me any thing. I needed to see if he knew the subject. I had pictures of a gentleman using her debit card at an ATM.

Page 17

Q So you reached out to Mr. McPhie?
A Yes.
Q Where did the confidential informant come into play on that?
A I don't recall.
Q What did he tell you about Vivianne Washington?
A I don't recall.
Q Did McPhie send you any information from a confidential informant regarding Vivianne Washington?
A I don't recall. I'm sorry. I wish I could.
Q Do you recall getting a picture of Vivianne Washington from McPhie?
A No.
Q Were you aware that there was a picture of Vivianne Washington forwarded from McPhie?
A Yes.
Q What was your understanding of where that came from?
A Where it came from?
Q You were aware there was a photo of Vivianne Washington used in the investigation that was shown to Mr. Heard. Where did the photo come from?
A I assume it came from McPhie. It wasn't sent to me.

Page 18

Q Was the photo ever in your possession?
A No.
Q So from your recollection, the only thing you corresponded with McPhie about was Cameron and his role in the robbery of the pocketbook?
A From what I can recall, yes, ma'am.
Q What did you do with the information he gave you about Cameron?
A I can't recall.
Q Moving forward from that, at this point we're in the weekend. The crime happened on a Thursday night. It was early Friday morning that you were securing the scene. You spoke with McPhie about Cameron on Friday. Do you recall any of the steps you took over the weekend in the investigation?
A No, ma'am.
Q Tell me about your involvement. We're on Monday, August 8th, at this point when you bring in Mr. Heard. Tell me about your involvement in interviewing Heard and getting him to the station.
A I didn't have any involvement. I didn't interview Heard.
Q Were you present for the interview of Heard?
A No. I was not in the room.
Q Did you know it was happening?

Page 19

A Yes.
Q What were you doing at the time?
A I was probably looking at the videotape to see what he said. It was a videotaped interview.
Q So you were watching interview while it took place?
A Yes.
Q Prior to him coming to the station, were you involved in bringing him in in anyway?
A No.
Q I believe there was a search warrant executed at his house.
A That was afterwards. It was a -- I don't believe it was a search warrant. I think it was a fourth amendment clause because he was on probation.
Q Did you carry out that search? Were you involved?
A Yes.
Q Do you recall speaking with him while you were there?
A I did not.
Q Did you communicate with Mr. Howard at all while he was conducting the interview --
A No.
Q When do you first remember hearing the name

Page 20

Vivianne Washington?
A I don't.
Q We know you obtained a warrant for her arrest.
A That is correct.
Q Why did you do that?
A Based on the information from Mr. Heard.
Q Did someone tell you to go obtain the warrant?
A No.
Q So you watched the Heard video and heard him say something that you thought --
A I can't recall. I hate to sit here and tell you something that I don't know for sure. He said -- this is going to -- he said there was a female there. She had a baseball cap on. From what I recall, he said she had a baseball cap and she was -- I'm just using what I think he said -- he said butch-like.
Q We have the video, so it's okay.
A And then I don't know if it was me or Lieutenant Howard reached out to McPhie or if he reached out to us and said the CI -- I don't know how that came about. The information was shared. I am almost positive it wasn't texted to me. The picture was shown. He said it was her. Based on that

information, Heard identified her. That is when I went to Judge Brown.
**Q Prior to going to Judge Brown, did you discuss the decisions to see the warrant with anyone?**
A Me and Lieutenant Howard were always in discussion through the investigation.
**Q At what point did you decide to seek the warrant? Was the Heard interview still in process at that point?**
A I doubt it was in process. It was probably shortly thereafter.
**Q Did you take any additional steps to investigate the claims that were made by Mr. Heard regarding Ms. Washington before you applied for the warrant?**
MR. HENSEL: Object to the form of the question. You can still answer.
THE WITNESS: I can't remember. There were a lot of steps that I can't remember.
**Q (MS. HICKEY) From your recollection, you saw the interview of him identifying her, and then you spoke with Lieutenant Howard. And shortly thereafter you applied for the warrant?**
A Yes.
**Q But you don't recall if you did anything**


**else before applying for the warrant?**
A I can't remember.
**Q Did you attempt to ascertain Ms. Washington's whereabouts that night at any point?**
A I'm sure I did. I just don't remember.
**Q Tell me about the process for obtaining a warrant. I'm sure this is something that you have done a good bit during your time there?**
A Yes, ma'am.
**Q When you are seeking an arrest warrant, tell me a little bit about what you do to get one.**
A I take all of the information that I have -- -- the bio data on the individual I want to see the warrant with. I call -- if it is during work hours, I just go to the courthouse. If it is not during work hours, I will call. I will sit down with Judge Brown in her office. I explain in detail the information that I have. She decides whether or not there is enough probable cause to issue that warrant.
**Q Do you prepare any formal paper or anything like an application or anything?**
A No, ma'am.
**Q So in this case you sought out Judge Brown. Where did you meet?**
A The courthouse.


**Q You went to the courthouse. What did you present to Judge Brown?**
A The evidence that I had.
**Q What was that? What did you say?**
A I don't remember exactly what I said.
**Q Did you give her any paper of any kind?**
A No.
**Q Had you given evidence, paper, or other types of exhibits in the past?**
A No.
**Q So it is all oral testimony?**
A Yes.
**Q Do you know if this testimony is recorded?**
A No.
**Q No, it is not?**
A No, I don't know.
**Q So you met with Judge Brown and presented the evidence that you had, which from what you told me, it is what you watched Heard say on the video?**
MR. HENSEL: Object to the form of the question. You can answer.
THE WITNESS: What was the question?
**Q (MS. HICKEY) You don't recall presenting any other additional evidence?**
MR. HENSEL: Same objection.


THE WITNESS: No.
**Q (MS. HICKEY) Did you mention anything about the confidential informant to the judge?**
A I'm sure I did.
**Q What did you say?**
A I don't know.
**Q I would help you up with this if I could, but I don't know what you said.**
A I don't know either.
**Q Let's turn our attention somewhere else. In response to one of the interrogatories that we sent to you, you mentioned that you turned over the investigation to Lieutenant Howard at the scene. Can you explain what that means?**
MR. HENSEL: Can we see that? That should be the Washington investigation, not the Dow investigation.
MS. HICKEY: It is possible it was referring to that, but I wasn't sure. It is interrogatory number 13.
MR. HENSEL: That is different than what your question was. He turned --
MS. HICKEY: I think my initial confusion was it says he turned the investigation over to Lieutenant Howard as Durand was processing the

Page 25

crime scene at Ms. Dow's home. That would have been prior to any mention of Vivianne Washington.
THE WITNESS: I did not turn the scene over -- the investigation over to Lieutenant Howard.
**Q (MS. HICKEY) Why did you say that you did?**
A I guess I misunderstood the question. I think it was the investigation into Ms. Vivianne Washington.
MR. HENSEL: That is what it says. The question that she had --
MR. FILIPOVITS: Hold on.
**Q (MS. HICKEY) While we are sorting out the timing of it, did you turn over the investigation of Vivianne Washington to Lieutenant Howard?**
A Yes.
**Q What does that mean?**
A He handled all of the interviews.
**Q Was that something that you did a lot?**
A Uh-huh.
MR. HENSEL: Is that a yes?
THE WITNESS: Yes.
**Q (MS. HICKEY) What was your criteria in determining whether to turn something over to him?**
A I don't think there was a criteria.

Page 26

**Q Why did you turn over the Washington investigation?**
A Lieutenant Howard did all of the interviews for that investigation. He is a better interviewer than I am.
**Q Did you interview anyone in connection with this crime, other than Ms. Dow, at the hospital?**
A I can't recall.
**Q But, generally, it was not your practice to do the interviews?**
A Depending on the case.
**Q Why would Lieutenant Howard be conducting the interviews in this case?**
A He was a better interviewer than me.
**Q Fair enough. You met with the judge and presented evidence orally. What did the judge say in response to your evidence?**
A I guess she determined that there was enough probable cause. She signed the warrant.
**Q What did you do after you obtained the warrant?**
A We got it to Newnan PD.
**Q How did you get it to them?**
A I'm sure we probably faxed or scanned a copy of it.

Page 27

**Q At that point what was your involvement in Ms. Washington's arrest?**
A None.
**Q Did you communicate with Newnan PD as they were executing the warrant?**
A Not that I can recall.
**Q So you obtained the warrant and send it over to Newnan. What did you do after that in regards to the investigation?**
MR. HENSEL: Object to the form of the question. Maybe you could clarify what investigation.
**Q (MS. HICKEY) What did you do into the investigation of the Dow crime? What were your additional steps?**
A At the time I was doing a lot of warrants -- search warrants. I don't know from day-to-day. I can't recall what my next step was.
**Q Did you talk to any of the officers that were executing the warrant and arresting Vivianne Washington during the arrest or after?**
A I can't recall.
**Q Were you present when she was brought into the jail?**
A I don't know. I can't recall.

Page 28

**Q So I believe that would have been on August 8th, which was a Monday. Did you see or speak with Mr. Heard at any point?**
A During the whole investigation?
**Q During the whole investigation.**
A Yes.
**Q When did you speak with Mr. Heard?**
A The day he came to the sheriff's office.
**Q That was the day that he was interviewed in which he implicated Vivianne Washington?**
A Yes.
**Q Tell me about that conversation.**
A It wasn't a conversation.
**Q You said you spoke with him.**
A I think I asked him if he needed something to drink. I didn't interview him. My contact with him was limited.
**Q Had you spoken with Justin Grady at any point during your investigation into the murder?**
A Not that I can recall.
**Q Did you see Mr. Heard or Grady at the jail?**
A Yes.
**Q When was that?**
A We picked Grady up from Spalding County and brought him to Meriwether.

MR. HENSEL: Is it Spalding or Paulding?
THE WITNESS: Spalding. It was in Griffin.
Q (MS. HICKEY) Tell me about picking up Mr. Grady.
A We just went to pick him up and brought him for an interview.
Q Did you get him from his home?
A No, from the jail.
Q Do you know when that was?
A (Nonverbal answer.)
Q So you transported him to the jail. Did you remain with him after you brought him in?
A No.
Q Where did you go?
A I went back to my office.
Q At the sheriff's office?
A That's correct.
Q So ordinarily what would bring you to the jail as part of your job? Why would you be there?
A Inside the jail? Just turning in warrants.
Q Did you spend much time at the jail?
A The jail is part of our office. But I didn't spend much time in the back.
Q But it is part of the same building as the office?



A Yes.
Q Are you generally made aware when new people are brought into the jail?
A No.
Q Did you see Vivianne Washington at the jail at any point?
A Not that I can recall.
Q So I guess you don't recall speaking with her at the jail either?
A No.
Q Did you transport her to a polygraph test?
A I don't think I was there for that.
MS. HICKEY: Can we take a five-minute break, please?
MR. HENSEL: Sure.
(Recess taken at 12:55 p.m.)
(Deposition resumed at 1:03 p.m.)
Q (MS. HICKEY) Did you participate at all in the decision to release Vivianne Washington?
A Not that I can recall.
Q Did you have any discussions with Lieutenant Howard or anyone else about that?
A I'm sure we did. I don't remember what I said or what we talked about.
Q Did you speak with Vivianne Washington at any



point after she was released?
A No.
Q Did you have a discussion about Vivianne Washington with any other officers after her release?
A No.
Q We do know of one. I want to direct your attention back to Exhibit 3. Look over the last paragraph of McPhie's statement. He mentions that he spoke with you two days after her release on the 11th.
A Okay.
Q So McPhie mentions in his narrative that he informed you that Vivianne Washington's mother had been inquiring about her status at the jail. Did you speak with her mother after receiving that information?
A No, I never spoke with her mother.
Q Did you do anything to follow up with McPhie after receiving that information?
A Not that I recall.
Q Going back to the photo of Vivianne Washington, what phone were you using at that time?
A A phone provided by the Meriwether County Sheriff's office.
Q Do you still have access to it?
A No, ma'am.
Q If you were using e-mail for that



communication, which e-mail address would it have been?
A I have no idea what my e-mail was at the sheriff's office.
Q But it would have been an e-mail from the sheriff's office?
A Yes.
Q So have you looked to see if you have that photo?
A No.
Q In Mr. Heard's interview he mentioned that they were in a black car that was being driven by Ms. Washington. Did you to take any steps to investigate the car? Whether it was owned --
A I can't recall.
Q Exhibit 1, which is a copy -- I'm sorry -- Exhibit 2 is a copy of the incident report. I want to direct your attention to a narrative by Officer Bese about a traffic stop of Mr. Calvin Jack Moreland.
A Do you want me to read this really quick?
Q If it would help refresh your memory.
A Okay.
Q Did you receive this information from Officer Bese during your investigation?
A I would assume so, yes.

**Q Did you take any follow-up steps based on this information?**

A I cannot recall.

**Q Is there anything that you do recall in relation to this investigation that we have not discussed yet?**

A No.

MS. HICKEY: I guess we're done here.

MR. FILIPOVITS: Hold on one second.

**Q (MS. HICKEY) Is there anything that you could refer to that would help you jog your memory about the investigation?**

MR. HENSEL: Object to the form of the question. You can answer.

THE WITNESS: The report is the only thing that I could refer back to.

**Q (MS. HICKEY) Is it standard practice to put all of the investigative notes into that report?**

A Yes.

**Q Would you have documented your investigative steps somewhere else?**

A No. I pretty much put everything in the report.

MS. HICKEY: Thank you very much.

MR. HENSEL: No questions.



(Deposition concluded at 1:09 p.m.)

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness has been reserved.)



D I S C L O S U R E

\- - -

STATE OF GEORGIA
COWETA COUNTY

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as an independent contractor for Elizabeth Gallo Court Reporting. Elizabeth Gallo was contacted to provide court reporting services for this deposition. I am not taking this deposition under any contract that is prohibited by O.C.G.A. § 15-14-37(a) and (b).

I have no contract or agreement to provide court reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Elizabeth Gallo will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

This 21st day of MAY 2019

\- -

JENNA JOHNSON, CVR, CCR
ELIZABETH GALLO COURT REPORTING



C E R T I F I C A T E

STATE OF GEORGIA
COWETA COUNTY

I, Jenna Rose Johnson, hereby certify that the foregoing deposition was taken down by me, as stated in the caption; the colloquies, statements, questions, and answers thereto were reduced to typewriting under my direction and supervision; and the transcript is a true, correct, and complete record of the testimony/evidence given.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney, nor am I financially interested in the action.

This 21st day of MAY 2019

______________________________

Jenna Rose Johnson, CVR, CCR
Certificate No.: 5818-4261-2151-9104

CASE: Vivianne Jade Washington vs Investigator Jason Durand, et al.
NAME OF WITNESS: Jason Durand

The preceding deposition was taken in the matter, on the date and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the deponent will read and sign the transcript of said deposition.

Said jurat is to be returned within 30 days following receipt of the transcript to the following address:

Elizabeth Gallo Court Reporting, LLC
2900 Chamblee Tucker Road
Building 13, First Floor
Atlanta, Georgia 30341



NAME OF CASE: Vivianne Jade Washington vs Investigator Jason Durand, et al.
DATE OF DEPOSITION: 05/21/2019
NAME OF WITNESS: Jason Durand
EGCR Job No.: 58648

CERTIFICATE

Before me this day personally appeared JASON DURAND, who, being duly sworn, states that the foregoing transcript of his/her deposition, taken in the matter, on the date and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

____________________
JASON DURAND

SUBSCRIBED and SWORN to before me this _________ day of ____________ 20____, in the jurisdiction aforesaid.

_________________ _________________
My Commission Expires Notary Public

STATE OF ________________________
COUNTY/CITY OF ____________________

[] No changes made to the Errata Sheet; therefore, I am returning only this signed, notarized certificate.

[] I am returning this signed, notarized certificate and Errata Sheet with changes noted.



Errata Sheet

NAME OF CASE: Vivianne Jade Washington vs Investigator Jason Durand, et al.
DATE OF DEPOSITION: 05/21/2019
NAME OF WITNESS: Jason Durand
Reason Codes: 1. To clarify the record
2. To correct transcription errors
3. Other

________________________________________
________________________________________

Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________

SIGNATURE:___________________DATE:______
Jason Durand



Errata Sheet

NAME OF CASE: Vivianne Jade Washington vs Investigator Jason Durand, et al.
DATE OF DEPOSITION: 05/21/2019
NAME OF WITNESS: Jason Durand
Reason Codes: 1. To clarify the record
2. To correct transcription errors
3. Other

________________________________________
________________________________________

Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________
Page ____ Line _____ Reason _____
From ___________________ to ___________________

SIGNATURE:___________________DATE:______
Jason Durand

**Exhibits**

**Plaintiff's Exhibit 03** 3:10 15:22 31:7

**1**

**1** 32:16
**11th** 31:9
**12:16** 4:3
**12:55** 30:16
**13** 24:20
**1:03** 30:17
**1:09** 34:1

**2**

**2** 32:17
**2012** 6:19
**2016** 10:19 16:5

**3**

**3** 15:22 16:1 31:7
**30(e)** 34:7
**3:18-cv-00086-tcb** 4:10

**4**

**4** 10:19

**5**

**5** 16:5

**8**

**8th** 18:18 28:2

**9**

**9-11-30(e)** 34:8
**97** 5:9

**A**

**Absolutely** 15:24
**access** 31:23
**additional** 14:4 21:12 23:24 27:15
**address** 32:1
**advised** 15:17
**agreement** 4:11
**ahead** 10:14 15:25
**alert** 12:8
**altogether** 5:25
**amendment** 19:15
**and/or** 34:8
**answering** 6:25
**answers** 4:20
**application** 22:21
**applied** 21:14,23
**applying** 22:1
**arrest** 8:10 20:4 22:10 27:2,21
**arresting** 27:20
**arrived** 10:17 11:10
**ascertain** 22:3
**assume** 16:12 17:24 32:25
**Assuming** 14:2
**ATM** 16:25
**attached** 4:2
**attempt** 22:3
**attention** 24:10 31:7 32:18
**August** 10:19 16:4 18:18 28:1
**aware** 17:15,21 30:2

**B**

**back** 6:11,12 10:3 13:14,15,22 14:2,7,13, 14 15:3,5 29:15,23 31:7,19 33:16
**background** 5:5
**baseball** 20:16,17
**based** 16:8 20:7,25 33:1
**basic** 12:10
**bed** 14:24
**began** 4:3
**Bese** 32:18,24
**bio** 22:13
**bit** 8:18 12:21 22:8,11
**black** 13:11 32:12
**break** 4:23,25 30:14
**briefly** 12:16
**bring** 18:18 29:18
**bringing** 19:9
**brought** 27:23 28:25 29:5,12 30:3
**Brown** 21:2,3 22:16,23 23:2,17
**building** 29:24
**butch-like** 20:18

**C**

**call** 9:6 10:23,24 11:1 16:10 22:14,16
**called** 8:25 10:17,22 11:2
**calling** 11:12
**calls** 6:25
**Calvin** 32:19
**Cameron** 16:15,16 18:4,8,14
**canine** 5:18
**cap** 20:16,17
**captain** 7:25
**car** 32:12,14
**card** 16:25
**career** 6:4 10:1
**careers** 5:20
**carry** 19:16
**case** 4:9 15:14,16 22:23 26:11,13
**change** 5:20 6:4 10:1
**charge** 7:12 9:18
**child** 8:9
**CI** 20:22
**Civil** 34:8
**claims** 21:13
**clarify** 27:11
**clause** 19:15
**coherent** 12:8
**committed** 10:20
**communicate** 16:10 19:22 27:4
**communication** 32:1
**companies** 6:9
**Company** 5:24
**concluded** 34:1
**condition** 12:17
**conducted** 10:6
**conducting** 19:23 26:12
**confidential** 15:13 16:11 17:3,10 24:3
**confusion** 24:23
**connection** 8:11 26:6
**construction** 5:24 6:6 10:3
**contact** 16:5,9 28:16
**conversation** 14:8 28:12,13

**copy** 26:24 32:16,17

**Corporal** 7:3 9:16

**correct** 5:6,7 10:25 20:5 29:17

**corresponded** 18:4

**county** 5:14,15,19 6:24,25 9:14,22 10:8 28:24 31:21

**couple** 15:5

**courthouse** 22:15,25 23:1

**crime** 10:19 11:13 13:22 14:11,20 16:22 18:11 25:1 26:7 27:14

**crimes** 7:12 8:6

**criteria** 25:23,25

D

**data** 22:13

**day** 9:4 14:20 15:3 28:8, 9

**day-to-day** 27:17

**daylight** 14:12

**days** 31:9

**debit** 16:25

**decide** 6:12 21:7

**decides** 22:18

**decision** 9:2 30:19

**decisions** 21:4

**degree** 5:6

**department** 7:11 15:10,13 16:4

**Depending** 26:11

**deposition** 4:8,10 5:2 30:17 34:1

**deputies** 10:17,22 13:21

**deputy** 5:18

**describe** 12:6

**detail** 22:17

**determined** 26:18

**determining** 25:24

**direct** 9:20 31:6 32:18

**directly** 15:16

**disciplined** 10:10

**Disclosure** 4:1

**discuss** 8:10 21:4

**discussed** 33:6

**discussion** 21:6 31:3

**discussions** 30:21

**documented** 33:20

**Dorothy** 8:12

**doubt** 21:10

**Dow** 8:12 10:7,11 11:8, 15,20 12:5,16 24:16 26:7 27:14

**Dow's** 16:21 25:1

**drilling** 15:8

**drink** 28:16

**driven** 32:12

**Durand** 4:6,9 24:25

**duties** 6:22 7:11

E

**e-mail** 16:9 31:25 32:1, 3,5

**early** 18:12

**enforcement** 5:11,25 6:11,13 14:16

**events** 10:15

**evidence** 16:1 23:3,8, 18,24 26:16,17

**executed** 19:12

**executing** 27:5,20

**Exhibit** 15:22 31:7 32:16,17

**exhibits** 23:9

**explain** 22:17 24:14

F

**Fair** 26:15

**family** 11:25

**faxed** 26:24

**Federal** 34:7

**feel** 4:23

**felt** 13:1

**female** 13:7 20:15

**FILIPOVITS** 25:12 33:9

**firsthand** 12:23

**five-minute** 30:13

**follow** 31:16

**follow-up** 33:1

**form** 4:13 21:16 23:20 27:10 33:13

**formal** 22:20

**forward** 18:10

**forwarded** 17:16

**fourth** 19:15

**free** 4:23

**Friday** 18:12,14

G

**gave** 18:7

**GBI** 11:12 13:22

**generally** 6:23 26:9 30:2

**gentleman** 16:25

**Georgia** 6:24

**give** 23:6

**good** 22:8

**graduated** 5:10

**Grady** 28:18,21,24 29:4

**Griffin** 29:2

**guess** 25:7 26:18 30:8 33:8

H

**half** 7:4,6,17

**handled** 25:18

**happened** 9:4 12:3 15:1 18:11

**happening** 18:25

**happy** 4:25

**hate** 20:13

**head** 4:22

**heard** 12:21 17:23 18:19,20,22,23 20:7,11 21:1,8,13 23:19 28:3,7, 21

**Heard's** 32:11

**hearing** 19:25

**helped** 8:20,22

**HENSEL** 4:15 21:16 23:20,25 24:15,21 25:10,21 27:10 29:1 30:15 33:13,25

**HICKEY** 4:5,8,18 15:24 21:20 23:23 24:2,18,23 25:6,13,23 27:13 29:3 30:13,18 33:8,10,17,24

**Hold** 25:12 33:9

**home** 14:24 15:4 16:19 25:1 29:7

**homicide** 8:9

**honest** 15:5

**hospital** 11:9,14,19,23 13:13 26:7

**hours** 15:5 22:14,16

**house** 11:8 12:22 19:12

**Howard** 7:18 11:3,12 13:23,25 14:3,8 15:15, 17 19:22 20:21 21:5,22 24:13,25 25:5,15 26:3, 12 30:22

**I**

**idea** 14:1 32:3
**identification** 13:3 15:23
**identified** 21:1
**identify** 13:10
**identifying** 21:21
**implicated** 28:10
**incident** 16:19,20 32:17
**individual** 22:13
**informant** 15:13 16:11 17:3,10 24:3
**information** 5:5 13:2 15:13,18 16:13,15 17:9 18:7 20:7,23 21:1 22:12,17 31:14,17 32:23 33:2
**informed** 31:12
**initial** 24:23
**inquiring** 31:13
**Inside** 29:20
**interrogatories** 24:11
**interrogatory** 24:19
**interview** 11:15 12:9 13:2 18:22,23 19:4,5,23 21:8,21 26:6 28:16 29:6 32:11
**interviewed** 28:9
**interviewer** 26:4,14
**interviewing** 18:20
**interviews** 25:18 26:3, 10,13
**introduce** 16:1
**invasion** 16:19
**investigate** 8:6 13:5 14:5 21:13 32:14
**investigated** 7:12 8:15
**investigation** 8:13 9:10 10:7,11,12,15 14:3 15:10 17:22 18:15 21:6 24:13,16,17,24 25:4,8, 14 26:2,4 27:9,12,14 28:4,5,19 32:24 33:5,12
**investigations** 7:4,8, 11 8:19 10:7
**investigative** 7:16 9:19 33:18,20
**investigator** 8:21,23, 24 9:5,6 10:23
**involved** 10:16 19:9,17
**involvement** 18:17,19, 21 27:1
**involving** 16:17
**issue** 22:19

**J**

**Jack** 32:19
**jail** 27:24 28:21 29:8,11, 19,20,21,22 30:3,5,9 31:13
**Jason** 4:6,8
**JENNIFER** 4:18
**job** 6:22 7:10 29:19
**jog** 33:11
**judge** 21:2,3 22:16,23 23:2,17 24:3 26:15,16
**Justin** 28:18

**K**

**kind** 11:7 16:17 23:6
**knew** 16:24

**L**

**late** 14:10,19
**law** 5:11,25 6:11,12 14:15
**lead** 8:21,22,24 9:6,10
**learn** 15:12
**learning** 15:19
**leave** 5:19 9:22
**left** 5:25 8:4 10:8 13:13
**Lieutenant** 7:18 11:3, 12 13:23,24 14:3,8 15:15,17 20:21 21:5,22 24:13,25 25:4,15 26:3, 12 30:21
**lights** 13:8
**limited** 28:17
**long** 5:15 6:8 7:1,15 11:16 12:10 15:4
**looked** 32:8
**lot** 12:9 21:19 25:19 27:16

**M**

**made** 21:13 30:2
**make** 4:20
**makes** 9:2
**male** 13:7
**marked** 15:22
**Mcphie** 15:9 16:3,8,10, 13 17:1,9,13,16,24 18:4,13 20:21 31:11,16
**Mcphie's** 31:8
**means** 24:14
**meet** 11:24,25 22:24
**memory** 32:21 33:11
**mental** 12:6
**mention** 24:2 25:2
**mentioned** 24:12 32:11
**mentions** 16:4,8 31:8, 11
**Mercer** 5:6
**Meriwether** 6:16,18,25 9:14,22 10:8 28:25 31:21
**message** 16:12
**met** 13:23 23:17 26:15
**midnight** 14:11
**misdemeanor** 8:8
**misunderstood** 25:7
**molestations** 8:9
**Monday** 18:18 28:2
**Moreland** 32:19
**morning** 14:12,19 18:12
**mother** 31:12,14,15
**Moving** 18:10
**murder** 8:12,13 28:19
**murders** 8:15

**N**

**narrative** 16:3 31:11 32:18
**needed** 12:4 16:23 28:15
**Newman** 5:24
**Newnan** 15:9,12 16:3 26:22 27:4,8
**night** 18:12 22:4
**night/early** 14:19
**nodding** 4:22
**nonverbal** 29:10
**notes** 33:18
**notice** 4:11
**number** 4:10 16:1 24:20

**O**

**O.C.G.A.** 34:8
**Object** 21:16 23:20 27:10 33:13
**objection** 23:25
**objections** 4:12
**obtain** 20:8
**obtained** 20:3 26:20 27:7

**obtaining** 22:6
**offender** 7:13
**office** 5:14 6:5 8:4 9:23 13:15,17,23 14:7 15:9 22:17 28:8 29:15,16,22, 25 31:22 32:4,6
**officer** 9:17 32:18,24
**officers** 27:19 31:4
**on-call** 9:3,4
**oral** 23:11
**orally** 26:16
**ordinarily** 29:18
**owned** 32:14

P

**p.m.** 4:3 30:16,17 34:1
**pain** 12:9
**paper** 22:20 23:6,8
**paragraph** 31:8
**paragraphs** 16:6
**part** 29:19,22,24
**participate** 30:18
**pass** 16:14
**past** 23:9
**patrol** 5:18 6:21 9:16 13:20
**Patrolling** 6:24
**Paulding** 29:1
**PD** 26:22 27:4
**people** 9:9,16 11:25 30:2
**phone** 16:12 31:20,21
**photo** 17:21,23 18:1 31:19 32:9
**physical** 12:6
**pick** 29:5
**picked** 28:24
**picking** 29:3
**picture** 17:12,15 20:24
**pictures** 16:24
**place** 16:18 19:6
**plaintiff's** 15:22
**play** 17:4
**pocketbook** 16:21 18:5
**point** 6:1 9:7 12:7,14 13:17 15:10 18:10,18 21:7,9 22:4 27:1 28:3, 19 30:6 31:1
**Police** 15:9,12 16:3
**politics** 6:4
**polygraph** 30:11
**positive** 13:3 20:24
**possession** 18:1
**practice** 26:9 33:17
**prepare** 22:20
**present** 18:23 23:2 27:23
**presented** 4:1 23:17 26:16
**presenting** 23:23
**preserve** 11:8
**pretty** 11:4 14:10,19 33:22
**previously** 4:7
**prior** 8:15,22 16:19 19:8 21:3 25:2
**probable** 22:19 26:19
**probation** 19:15
**Procedure** 34:8
**proceedings** 4:3
**process** 11:13 21:8,10 22:6
**processed** 14:5,22,25
**processing** 24:25
**promoted** 7:2,3,7
**proposing** 4:12
**provided** 31:21
**pursuant** 4:11 34:7
**put** 16:5,9 33:17,22

Q

**question** 4:13,21,24 14:6 21:17 23:21,22 24:22 25:7,11 27:11 33:14
**questions** 12:10 15:7 33:25
**quick** 16:6 32:20

R

**rank** 5:17 6:20 7:24
**reached** 17:1 20:21,22
**read** 32:20
**reading** 4:13,16
**recall** 10:6 12:11,13 15:11,16 17:5,8,11,12 18:6,9,14 19:19 20:13, 16 21:25 23:23 26:8 27:6,18,22,25 28:20 30:7,8,20 31:18 32:15 33:3,4
**receive** 5:8 32:23
**received** 11:1 16:3
**receiving** 31:14,17
**recess** 30:16
**recognized** 12:24
**recollection** 18:3 21:20
**recorded** 23:13
**refer** 33:11,16
**referring** 24:18
**refresh** 32:21
**registry** 7:13
**relation** 33:5
**release** 30:19 31:4,9
**released** 31:1
**remain** 29:12
**remember** 7:23,24 11:16 12:17,22 13:5 14:4,20 15:19,21 19:25 21:18,19 22:2,5 23:5 30:23
**report** 32:17 33:15,18, 23
**reported** 7:22 9:15
**Reporter's** 4:1
**reserve** 4:12
**reserved** 34:9
**resigned** 5:21
**responded** 11:2
**response** 24:11 26:17
**responsibilities** 6:23
**resumed** 30:17
**roads** 6:24,25
**robbery** 18:5
**role** 8:19 10:10 18:5
**room** 18:24
**route** 11:2
**Rule** 34:7
**Rules** 34:7

S

**Sanquavious** 16:15
**scanned** 26:24
**scene** 10:18 11:2,3,6, 13,14,17,21 13:15,20, 21,22 14:5,11,13,14,15, 18,22,25 18:13 24:13 25:1,3
**schedule** 9:3
**Scott** 7:24
**search** 19:11,14,16 27:17
**secured** 11:3,5 13:20 14:18
**securing** 18:13

**seek** 21:7
**seeking** 22:10
**send** 17:9 27:7
**sense** 7:15
**settled** 11:14
**sex** 7:13
**shaking** 4:22
**shared** 15:16 20:23
**sheriff's** 5:14 6:5 8:4 9:23 13:15,16,23 28:8 29:16 31:22 32:4,6
**shift** 15:2
**shortly** 21:11,22
**show** 15:24
**showing** 16:2
**shown** 17:22 20:25
**signature** 34:9
**signed** 26:19
**signing** 4:14,16
**sit** 20:13 22:16
**sleep** 14:25
**sorting** 25:13
**sought** 22:23
**Spalding** 28:24 29:1,2
**speak** 11:19,20 12:2,4,5,16 15:9 28:2,7 30:25 31:13
**speaking** 13:5 19:19 30:8
**specific** 15:7
**Specifically** 16:13
**spend** 29:21,23
**spoke** 18:13 21:22 28:14 31:9,15
**spoken** 28:18
**standard** 33:17
**start** 5:4,10 10:14 15:8
**started** 4:19 6:17,20 7:7,23 8:3
**state** 6:25 12:6
**statement** 31:8
**station** 18:20 19:8
**status** 31:13
**stay** 11:7
**step** 27:18
**steps** 14:4 18:14 21:12,19 27:15 32:13 33:1,21
**stipulations** 4:15
**stolen** 16:21
**stop** 32:19
**subject** 16:24
**subordinates** 9:20
**supervising** 9:9
**supervisor** 7:19 9:13
**supervisors** 7:21
**suspects** 12:14
**swear** 4:5
**sworn** 4:7

**T**

**table** 4:25
**talk** 13:24 14:15 27:19
**talked** 14:2 30:24
**talking** 15:15
**test** 30:11
**testified** 4:7
**testimony** 23:11,13
**text** 16:12
**texted** 20:24
**theft** 8:8
**thing** 9:12 14:12 16:23 18:3 33:15
**things** 4:19
**thought** 13:19 20:12
**Thursday** 18:12
**time** 7:18 8:7 9:14 10:1 15:2 16:18 19:2 22:8 27:16 29:21,23 31:20
**timing** 25:14
**tip** 8:1
**told** 11:7 12:13,20 23:18
**tongue** 8:1
**total** 7:16
**Totally** 15:1
**traffic** 32:19
**transport** 30:11
**transported** 11:9,11 29:11
**Troup** 5:14,15,19
**turn** 24:10 25:3,14,24 26:1
**turned** 24:12,22,24
**turning** 29:20
**types** 8:6 23:9

**U**

**Uh-huh** 25:20
**ultimately** 8:12
**underneath** 9:17
**understand** 5:5 12:20
**understandable** 15:1
**understanding** 17:18
**unit** 7:16 9:19
**University** 5:6

**V**

**verbal** 4:21
**video** 20:11,19 23:19
**videotape** 19:3
**Vivianne** 8:11 10:11 17:6,10,12,16,21 20:1 25:2,8,15 27:20 28:10 30:5,19,25 31:3,12,19
**voices** 13:8
**voluntarily** 5:21 8:5

**W**

**waited** 14:13
**waiting** 13:21
**walking** 10:15
**wanted** 13:4
**warrant** 19:11,14 20:3,9 21:4,8,15,23 22:1,7,10,14,19 26:19,21 27:5,7,20
**warrants** 27:16,17 29:20
**Washington** 4:9 8:11 10:11 17:7,10,13,16,22 20:1 21:14 24:16 25:2,9,15 26:1 27:21 28:10 30:5,19,25 31:4,20 32:13
**Washington's** 22:4 27:2 31:12
**watched** 20:11 23:19
**watching** 19:5
**weekend** 18:11,15
**whereabouts** 22:4
**white** 13:11
**work** 5:13 22:14,15
**worked** 11:12
**working** 5:10
**written** 16:2

**Y**

**year** 7:3,4,6,17
**years** 5:16 6:9 9:24 12:19 15:21
**yes-or-no** 4:21