IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

VIVIANNE JADE WASHINGTON,       )
                                )       CIVIL ACTION FILE
        Plaintiff,              )       NO. 3:18-cv-00086-TCB
                                )
v.                              )
                                )
INVESTIGATOR JASON DURAND,      )
in his individual capacity,     )
INVESTIGATOR HUGH HOWARD,       )
in his individual capacity,     )
                                )
        Defendants.             )

## DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

COME NOW Jason Durand and Hugh Howard (hereinafter also referred to as "Defendants," "Durand," and "Howard"), named defendants in the above-styled action, and pursuant to Fed. R. Civ. Pro. 56 and Local Rule 56.1, hereby file their Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried, showing the Court as follows:

1.

In August 2016, Sgt. Jason Durand ("Durand") with the Meriwether County Sheriff's Office was assigned to investigate a home invasion where an elderly woman, now known to be Ms. Dorothy Dow, the proprietor of a Meriwether

County blueberry farm, had been set on fire after a home invasion and burglary (hereinafter also referred to as "the Dow crime").  Howard depo., p. 13, ll. 8-18.

2.

Durand contacted his Lieutenant, Hugh Howard ("Howard"), and asked Howard to apply for a search warrant for Ms. Dow's residence.  Howard depo., p. 16, ll. 15-24.  That warrant was presented to Judge Shirlene (neé Brown) Lowery (hereinafter "Judge Lowery") in person by Howard; Judge Lowery confirmed probable cause and issued the search warrant.  Id. at p. 16, l. 25-p. 16, l. 9.

3.

Howard then met the Georgia Bureau of Investigations ("GBI") crime scene investigators at the courthouse and travelled with them to the scene where Durand was waiting.  Id. at p. 18, ll. 23-25.

4.

While the GBI and Durand secured and processed the crime scene, Howard went back to the sheriff's office to interview witnesses.  Id. at p. 22, ll. 1-3.

5.

During the investigation, Howard received a phone call from an employee of Ms. Dow's farm, Leonard Buchanan, who directed Howard to interview Cortavious Heard ("Heard"), another employee of Ms. Dow, about the Dow crime. Id. at p. 26, ll. 10-16.

6.

Howard learned that Heard was on probation and he was contacted and came to the Sheriff's Office but denied any knowledge of the Dow crime. Id. at p. 27, ll. 3-5.

7.

Howard contacted Heard's probation officers and requested that a search be conducted of Heard's residence per his Fourth Amendment probation waiver. Id. at 7-10.

8.

The probation officer conducted an initial search of Heard himself and found marijuana. Id. at 10-12.

9.

While Howard spoke with Heard, the team at Heard's residence found multiple items belonging to Ms. Dow. Id. at 14-19.

10.

Heard's grandmother spoke with Heard and convinced him to confess. Id. at 18-21.

11.

Heard was placed under arrest for possession of marijuana and taken to the jail to be further questioned regarding the Dow crime. Id. at 22-25.

12.

At the jail, Heard was interviewed and said it was Justin Grady ("Grady"), "a butch African American female in a black hat," and an unidentified black male who conducted the home invasion with him. Id. at p. 37, ll. 13-24.

13.

The investigative team, including Howard and Durand, then spoke with numerous agencies regarding the evidence provided about Heard and Grady. Id. at p. 41, ll. 7-13.

14.

While Howard was questioning Heard, Lt. Chris Warden, the narcotics officer for the sheriff's office, received a phone call from Victor McPhie ("McPhie"), a narcotics officer with the Newnan Police Department in Newnan, Georgia, who relayed he had information from his confidential informant ("CI") that included a picture of a woman named Vivianne Washington who was involved in the Dow crime. Id. at 17-23.

15.

Howard received the photograph from Warden, brought it to Heard, and asked if it was anyone he recognized. Id. at p. 42, ll. 1-3.

16.

Heard said that the woman in the photograph, who we now know was Plaintiff, was with him during the Dow crime and that she was wearing the same black hat he described earlier.  Id. at 3-6.

17.

After that statement, Howard learned from McPhie that the woman in the photograph was Plaintiff, that she worked at a pizza place in Newnan, and that she went to high school with Angel Harmon and Mina Ellery—the two females who have now been convicted of participating in the Dow crime. Id. at p. 42, l. 22-p. 43, l. 3.

18.

Howard spoke with Durand and then went through the process of obtaining an arrest warrant for Plaintiff, which Durand was to present to Judge Lowery. Durand depo., p. 21, ll. 3-11.

19.

Durand did not prepare any documents prior to seeking the warrant; instead, he went to the courthouse and orally testified as to the evidence known to the sheriff's office related to Plaintiff's involvement in the Dow crime based upon his conversations with Howard.  Id. at p. 22, l. 6-p. 23, l. 12.

20.

The arrest warrant was executed by Judge Lowery.  <u>See</u> Arrest Warrant, included in Certified Sheriff's Office records, attached hereto as Exhibit 1, p. 1.

21.

In Meriwether County, arrest warrant applications are always done orally by testifying to a Magistrate Judge of Meriwether County, who then types out the warrant based on the testimony of the officer.  Howard depo., p. 17, l. 16-p. 18, l. 16.

22.

In the late afternoon of August 8, 2016, Newnan Police arrived at Plaintiff's place of employment, Pie Five Pizza.  Plaintiff's Depo., p. 15, l. 23-p. 16, l. 5; p. 17, ll. 5-8.

23.

Plaintiff was booked at 6:33 p.m.  <u>See</u> Booking Report, Ex. 1.

24.

Before Plaintiff's booking, Howard offered Plaintiff a polygraph test. Howard depo., p. 49, ll. 18-20.

25.

In her complaint, Plaintiff alleges that she was then walked by Heard, who was housed in a cell with Justin Grady, another suspect in the Dow crime.  Doc. 1, ¶ 33.

26.

Plaintiff alleges that both Heard and Grady informed Howard that Plaintiff was not the "correct girl" involved in the Dow crime.  Id. at ¶ 34-35.

27.

Plaintiff testified she was taken past Heard's cell and Heard alone was asked if Plaintiff was a person involved in the crime on the farm. Plaintiff depo. at p. 28, ll. 12-20.

28.

Plaintiff cannot recall what Heard was wearing and had never seen him before in her "entire life" but is sure Heard was housed in a cell with an older man she could not identify.  Id. at p. 29, ll. 2-12.

29.

Heard was housed alone at the jail in an observation/isolation cell.  Howard depo., p. 46, ll. 22-25; p. 47, ll. 14-15; Ex. 1, Inmate Activity Report of Heard (showing Heard was housed in Isolation Cell 2 from 8/8/16 until 8/10/16).

30.

Grady was housed in Booking.  <u>See</u> Ex. 1, Inmate Activity Report of Grady (showing Grady was housed in either Booking Cell 1, 2, or General Population from 8/8/16 until his release to the Department of Corrections).

31.

Heard positively identified Plaintiff in the Dow crime by saying "that is the bitch I told you about" when Plaintiff was walked by his observation cell.  Howard depo., p. 49, ll. 1-6.

32.

Plaintiff was booked on an investigative hold.  <u>Id.</u> at. p. 80, ll. 4-8.

33.

Because of her investigative hold, Plaintiff would not be allowed phone calls, visitors, or interactions with other detainees.  <u>Id.</u> at ll. 9-13.

34.

The investigative hold is limited to 72 hours, after which Plaintiff would be released.  <u>Id.</u> at p. 57, ll. 8-12; p. 80, ll. 4-24.

35.

Within the hour after being booked, Plaintiff was questioned by Howard.  <u>Id.</u> at p. 31, ll. 2-5.

36.

Plaintiff was booked at 6:33 p.m. <u>See</u> booking report.

37.

At 9:17 p.m., Plaintiff was in LaGrange, Georgia, and signing documents to take a polygraph test. <u>See</u> Polygraph Documents.

38.

During her initial questioning, Plaintiff was shown photographs of Heard and the other persons believed to be involved in the Dow crime. Howard depo. at p. 31, ll. 2-11.

39.

Plaintiff admitted that she was related to the suspects during that conversation. Washington depo. at p. 32, ll. 13-19.

40.

Plaintiff was not coerced in any way to say that she knew Heard and the other suspected assailants involved in the Dow crime. <u>Id.</u> at p. 33, ll. 7-9.

41.

After that untruthful confession, Plaintiff was driven to LaGrange, Georgia, for a polygraph test. <u>Id.</u> at ll. 16-20.

42.

In LaGrange, Plaintiff was met by a polygrapher (not either Defendant), hooked up to a "machine," told instructions, and felt generally comfortable.  Id. at p. 35, l. 17- p. 36, l. 13.

43.

Plaintiff failed the polygraph test.  See Polygraph Documents, Ex. 1.

44.

After the polygraph test in LaGrange, Plaintiff admitted to being involved in the Dow crime.  Id. at p. 36, ll. 14-15; Exhibit 2, Polygraph Video of Plaintiff, 2:26 ("I was there.").

45.

Plaintiff then began making up details about her involvement and relaying them to Howard.  Washington depo. at ll. 24-25.

46.

Plaintiff told Howard she got into a car with three strange men and met up at the park with the other Dow assailants.  Id. at p. 37, ll. 1-2, Ex. 2 at 5:20.

47.

Plaintiff testified that she believes Howard believed her story up until he realized she was lying during their conversation after the polygraph.  Id. at p. 37, ll. 3-10.

48.

Based on the realization that Plaintiff's version of the facts were inconsistent with other evidence, Howard interviewed Heard again who confessed he lied about Plaintiff being involved.  Howard depo., p. 68, l. 20-p. 69, l. 3.

49.

Because he recanted his story, Heard was taken to the same polygrapher.  Id. at p. 69, ll. 9-17.

50.

Heard passed the polygraph (noting Plaintiff was not involved in the Dow crime), and Plaintiff was immediately released by contacting Judge Lowery, cancelling the warrant, and transporting Plaintiff back to her residence.  Id. at ll. 21-23; see also Heard Polygraph Results, Ex. 1.

51.

Heard was charged with making false statements because of his lie that Plaintiff was involved in the Dow murder.  Id. at  p. 85, ll. 16-24.

52.

McPhie confirmed the reliability of the C.I. by noting that they had been used in the past and that the C.I. contacted McPhie without being prompted. McPhie depo., p. 13, ll. 5-17.

Respectfully submitted,

**BUCKLEY CHRISTOPHER, P.C.**[1]


/s/ Taylor W. Hensel

_____

TIMOTHY J. BUCKLEY III
Georgia State Bar No. 092913
TAYLOR W. HENSEL
Georgia State Bar No. 572754
Attorneys for Defendants

2970 Clairmont Road NE
Suite 650
Atlanta, Georgia 30329
 (404) 633-9230 (telephone)
(404) 633-9640 (facsimile)
tbuckley@bchlawpc.com
thensel@bchlawpc.com

---

[1] Counsel for Defendants hereby certifies that this pleading was prepared in Times New Roman font, 14 point, in compliance with Local Rule 5.1.B.

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2019, I electronically filed DEFENDANTS JASON DURAND AND LIEUTENANT HUGH HOWARD'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED upon all parties to this matter using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Jeffrey Filipovits, Esq.

**BUCKLEY CHRISTOPHER, P.C.**

/s/ Taylor W. Hensel

_____
TIMOTHY J. BUCKLEY III
Georgia State Bar No. 092913
TAYLOR W. HENSEL
Georgia State Bar No. 572754
Attorneys for Defendants

2970 Clairmont Road, N.E.
Suite 650
Atlanta, GA 30329
(404) 633-9230
(404) 633-9640 (facsimile)
tbuckley@bchlawpc.com
thensel@bchlawpc.com