UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| VIVIANNE JADE WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | |
| INVESTIGATOR JASON DURAND, | ) | 3:18-cv-86-TCB |
| in his individual capacity, | ) | |
| INVESTIGATOR HUGH HOWARD, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff was arrested after a suspect identified her as a participant in a crime based on seeing a photo of her. But after that suspect saw Plaintiff in person, he stated that she was not a participant, and that officers had arrested the wrong person. There was no other basis for probable cause, and an abundance of exculpatory evidence available that confirmed Plaintiff's innocence. Lt. Howard ultimately realized his error, but not before he continued to hold Plaintiff in jail while continuing to interrogate her, ultimately extracting a false confession by repeatedly lying to her about the evidence against her and keeping her out-of-

1

communication with her family. Plaintiff's extended incarceration and the harm arising therefrom are the result of Lt. Howard's failure to re-assess probable cause and seek her release after learning exculpatory information that negated the magistrate judge's initial probable cause determination.

## I.    STATEMENT OF FACTS

### a.    The initial investigation

Lt. Howard and Sgt. Durand were assigned to investigate a home invasion where an elderly woman, Ms. Dorothy Dow, had been assaulted and set on fire. *See* Howard Dep. 13:8–18. After the attack, Ms. Dow was able to describe her assailants as "several black males and an African American female." Howard Dep. 24:18–21. Ms. Dow owned a blue berry farm, and paid contractors to pick blueberries.

The weekend after the attack, during an intense investigation, Lt. Howard received a phone call stating that they "needed to look at" Cortavious Heard and Justin Grady, both of whom were sometimes employed at Ms. Dow's blueberry farm. Howard Dep. 26:8–16. The information presented to Lt. Howard was only that he "needed to look at" these two individuals. Howard Dep. 28:11–20.

Howard initially interviewed Grady, who stated that he did not want to speak with police. Howard Dep. 30:3–22. At that point, Grady was free to go. Howard Dep. 32:9–19.

Howard next interviewed Heard, who appeared at the Sheriff's Office for a voluntary interview. Howard Dep. 35:15–25. During his interview, Heard denied involvement in the home invasion. *See generally* Heard Int. #1. During the interview, Lt. Howard noticed that it appeared Heard had blood stains on his shoes, and took the shoes for testing. Heard Int. #1 at 13:30.

Next, because Heard was on probation, and had executed a Fourth Amendment waiver as a condition of that probation, Lt. Howard stated that he needed Heard's phone and to search Heard's residence. *See* Heard Inv. Notes, Doc. 54-3 at 9. When searching Heard's residence, officers found items belonging to Ms. Dow, and Heard confessed that he had been present at a home invasion. *Id.* They also found marijuana. He was then arrested for possession of marijuana, and taken back to the Sheriff's Office for a custodial interview. Howard Dep. 27:2–25.

During Heard's interrogation, Heard signed a Fifth Amendment waiver and spoke with Lt. Howard. Heard Int. #2 c. 2:55. Heard identified Justin Grady as being involved in the home invasion. *Id.*

3

Heard's statement is difficult to understand on video. *See* Heard Int. #2 c. 4:00. Heard stated that there was a planned burglary and that, on the way there, he and Grady dropped off his girlfriend. *Id.* He presented a story which minimized his involvement, and painted Grady as the primary actor. *Id.* c. 7:15.

During Heard's interrogation, Officer McPhie of the City of Newnan police department sent a photo to Lt. Chris Warden of the Meriwether Sheriff's Office. Howard Dep. 41:17–25. McPhie told Warden that McPhie "heard she [the subject of the photo] was involved in this" and provided the name "Vivianne Washington." Howard Dep. 41:22–23.[1] In spite of receiving *numerous* tips which were irrelevant, *see* Howard Dep. 39:4–22,[2] Lt. Howard did not attempt to communicate with Ofc. McPhie about the photograph or the information provided by his confidential informant. Howard Dep. 42:7–11. At that point, Lt. Howard only that an unnamed confidential informant had stated that Plaintiff "was involved." Howard Dep. 42:12–18.

---

[1]Due to the severity of the crime and media attention, there were numerous tips coming from various channels, including a hotline set up by the Sheriff's Office. Lt. Howard testified that they were following up numerous leads. *See* Howard Dep. 39:4–22.

[2] Lt. Howard explained that when there is a high profile crime, it is common for some "nuts to call in" with fanciful tips. Howard Dep. 43:22–44:4.

Lt. Howard then returned to the interview showed the photograph to Heard. Heard stated that the person in the photograph was the same as one of the other people who participated in the home invasion. He stated that she was wearing the same hat (which was a plain black hat). Heard Int. #2 c. 11:00.

After the positive identification, Howard learned that the subject of the photo was Vivianne Washington. Based on the identification and the anonymous confidential informant statement, Defendants obtained an arrest warrant for Ms. Washington. Howard Dep. 48:7–13.

Durand was responsible for obtaining the warrant for Ms. Washington. Howard Dep. 58:14–18. The warrant affidavit was conclusory on its face. *See* Doc. 54-3 at 1. It merely recited the elements of the offense. *Id.* [3]

Neither Howard nor Durand know what information Durand might have communicated to the magistrate judge beyond that which was included in the warrant. *See* Howard Dep. 60:17–19; Durand Dep. 26:15–19. There is no record of the testimony presented to the magistrate, but the face of the warrant indicates that

---

[3] It is identical to the warrant the Eleventh Circuit held facially inadequate and unsupported by probable cause in *Garmon v. Lumpkin County*, 878 F.2d 1406 (11th Cir. 1989). Like the warrant in Garmon, the warrant recites that it is based on the "above affidavit," and the above affidavit merely recited the elements of the crime.

it was based on "sufficient causes made known to me in the above affidavit . . . ."
Doc. 54-3 at 1.

> **b.**    **Plaintiff's arrest and interrogation**

Plaintiff was arrested at 4:45 p.m. on August 8, 2016. *See* Ex. 1, Arrest
Report, at 9. After Plaintiff's arrest, she initially stated that she wanted to speak
with a lawyer after expressing confusion about what was happening and why she
had been arrested. *See generally* Washington Int. #1.  *Id.* at 1:00. Lt. Howard then
terminated the interview, and Plaintiff was taken to a segregation cell in the jail.
Howard Dep. 81:7–11.

Later, Plaintiff sent a note through the jailer stating that she wished to speak
with Lt. Howard. *Id.* Ms. Washington then signed a Fifth Amendment waiver, and
Howard proceeded with an interrogation. Ms. Washington told Howard that, at the
time of the crime, she was home with her mother, and there were other people at
her home as well. Washington Int. #2 at 18:00.

Lt. Howard immediately began by giving Plaintiff a story to follow. He
asked: did you drive your vehicle down to Forest Grove on February 9th and, told
Plaintiff that only "whether you went into that house or not, is up for debate."
Washington Int. #2 at 18:42. Plaintiff then stated that she had never been to

6

Meriwether County. Washington Int. #2 at 18:42. When shown a photo of the other suspects, she said she never heard of "these people" (meaning the alleged perpetrators), before. Washington Int. #2 at 18:05.

Plaintiff then asked, hopefully, whether the victim of the crime could identify the perpetrators. Washington Int. #2 at 18:55. Lt. Howard then falsely stated that three people, who had been interviewed separately, had identified Plaintiff as being present at the crime. Washington Int. #2 at 19:02.

Lt. Howard then told her that they would be getting fingerprints and DNA. Plaintiff expressed hope at this prospect. *Id.* Howard said that such tests could take up to 6 months, to which Plaintiff responded, in apparent disbelief, "So I am supposed to be in here for 6 months?"Washington Int. #2 at 19:39. Howard stated that it was "quite possible and maybe longer." *Id.*

Lt. Howard then told Ms. Washington that there was an "over abundance of information" that she was "at least" at the scene of the crime. Washington Int. #2 at 20:01. He then falsely stated, again, that there were three separate people who looked at line ups and identified her. Washington Int. #2 at 20:15.

Howard then mentioned that the officers were going to ping Ms. Washington's phone, so that they would know where she was at the time of the

crime. Washington Int. #2 at 20:30. Ms. Washington was again hopeful, and asked if that shows that she was not in Meriwether County at all—but Howard interrupted and stated that too could be evidence of guilt, since a lot of people think they can leave their phones at home and get away with a crime. Washington Int. #2 at 20:53. Howard then stated that, even if her phone proved to be evidence of innocence, there were still three people who identified her. Washington Int. #2 at 20:58.

Lt. Howard then stated that he knew that Ms. Washington traded shifts with someone, and that she worked until about 10:00 p.m. Washington Int. #2 at 21:22. Ms. Washington then stated that after she left work, she returned home, took a shower, and was hanging out with her girlfriend. Washington Int. #2 at 21:31. She walked to the park with her girlfriend and returned. Washington Int. #2 at 21:57. Howard then said he was going to wait for the DNA evidence to come back. Washington Int. #2 at 22:58.

Ms. Washington willfully supplied the password to her cell phone to Howard. Washington Int. #2 at 30:42. Lt. Howard had Plaintiff's cell phone and could easily have accessed it. Washington Dep. 37:12–21.

Ultimately, after the interview, Howard had no evidence connecting Ms. Washington to the crime aside from Heard's identification and the statement from Officer McPhie's confidential informant. Howard Dep. 48:14–17. Howard did not learn any incrimination information from Ms. Washington during her interrogation. Howard Dep. 48:14–21, 56:13–15.

During the interrogation, Ms. Washington provided her girlfriend's name, and the names of other friends that she called. She also said that her mother, brother, niece, and nephew were at her house the evening of the crime, and that she was getting ready to go to a festival the next day. Washington Int. #2 at 35:02. Ms. Washington also willingly submitted to a DNA swab. Washington Int. #2 at 48:25.

Plaintiff was not allowed to make any phone calls or have any contact with her family (who could have exonerated her) because of an "investigative hold" which meant that Plaintiff could not have any contact with anyone outside the jail for a period of 72 hours. Howard Dep. 49:1–6, 57:8–12, 80:4–24.

Ms. Washington stated that she had never seen the other suspects when Lt. Howard presented photographs to her. Washington Int. #2 at 23:53, 25:36 (Howard stating "we've got three people you say you never met, all gotta do is confirm that one of them knows you and it's over").

9

Plaintiff also proposed that, if the people who identified her gave a description of her clothing, officers could go to her home and get them to have her clothing tested. Washington Int. #2 at 25:13. Howard did not do so.

### c.    Heard retracts his identification and Plaintiff remains incarcerated

After the interview, Howard intentionally walked Ms. Washington past Heard's cell to give him the opportunity to identify her. Howard Dep. 47:21–48:6, 48:22–49:6. Heard saw Ms. Washington and stated "that's not her." Washington Dep. 29:2–10.[4]

Plaintiff continued to remain incarcerated after Heard retracted his identification, and was ultimately released the next day. She spent a total of 25 hours in the jail. Washington Dep. 43:12–22.

Defendants' brief discusses continues past this point and discusses evidence that was acquired after Heard retracted his identification. This evidence includes the fact that Plaintiff ultimately offered a *false* confession after her polygraph examination in spite of being innocent.

---

[4] Defendants cite Lt. Howard's testimony that Heard actually said "that is the bitch I told you about" when Plaintiff walked by his observation cell. *See* Howard Dep. 49:1–6. For the purposes of summary judgment, this version is irrelevant. Plaintiff's testimony is that Heard stated that Plaintiff was not the person who was present during the home invasion, and this version controls.

10

This evidence is relevant to Plaintiff's damages, but not to liablity.[5]

This case demonstrates the ease with which a skilled interrogator can extract a false confession from an innocent[6] person. *See* Washington Dep. 36:14–37:4 (explaining that she gave a false confession because "How do you fight something that already came back positive in my eyes?[7] Y'all already don't believe me now.

---

[5] *See Blue v. Lopez*, 901 F.3d 1352, 1359 (11th Cir. 2018) ("in a malicious-prosecution case, the civil court measures whether the defendant had probable cause to believe a crime occurred as of the beginning of the criminal proceeding"); *Roddy v. City of Huntsville, Ala.*, 580 Fed. App'x 844, 851 (11th Cir. 2014) ("We ask what information was known to the arresting officer at the time of the arrest, not those facts known to the plaintiff at the time of arrest or those facts discovered after the arrest," and, when analyzing a claim for qualified immunity, the court "isolat[ed] what [the arresting officer] knew at the time he arrested [the plaintiff].").

[6] There is no doubt that Plaintiff is innocent of the underlying crime, and all four perpetrators have pled guilty to felony murder or malice murder. *See* Meriwether Clerk of Court Online Docket, http://www.meriwetherclerkofcourt.com/WebCaseManagement/mainpage.aspx (last visited November 6, 2019) (the criminal case number for all four prosecutions is 2017-cr-0555).

[7] Ms. Washington was referring to the results of the polygraph examination, which the polygrapher stated "physiological responses indicative of deception were noted" in response to the following questions: "Were you in that house last Thursday night?" and, "Were you present when that woman was beaten and burnt?" *See* Polygrapher Report, Doc. 54-3 at 17. It is obvious from her testimony that she saw the polygraph examination as some meaningful objective measure that could be used against her, and not the unreliable and scientifically dubious evidence which it actually is. *See, e.g.*, *Garmon v. Lumpkin Cty., Ga.*, 878 F.2d 1406, 1410 (11th Cir. 1989); *United States v. Russo*, 796 F.2d 1443, 1453 (11th Cir. 1986).

11

So this is even more of a reason like, oh, we really have her. Like this is stuck on it. This is golden. This is it. So, yeah, like then he was like saying, you know, like whoever makes—like gets the better deal—like whoever, you know, gets the most information gets the better deal. So I was just like—at this point I'm just making stuff up . . . .").[8] Plaintiff was not inconvenienced; she was subjected to repeated questioning, lies, and deliberate tactics which led her to believe that the best thing she could do is confess to a crime she did not commit.

## II.    ARGUMENT AND CITATION OF AUTHORITY

For the purposes of simplifying the legal issues here, Plaintiff elects to proceed only on her § 1983 claim against Lt. Howard.[9]

Given Heard's positive identification of Plaintiff's photograph, Plaintiff recognizes there was at least arguable probable cause for Plaintiff's initial arrest. This is because the Eleventh Circuit has held that even an uncorroborated statement of a co-conspirator can suffice to establish probable cause, so long as the

---

[8] Ms. Washington's statements accord with the approach Lt. Howard took in her interview, which he falsely told Plaintiff that three people picked Plaintiff out of a line up, that DNA tests would take 6 months, and that even if her cell phone pinged to a different location, that might be further evidence of her guilt since sometimes criminals know to leave their cell phones behind.

[9] Plaintiff, with consent of opposing counsel, will file the appropriate dismissal for Sgt. Durand.

confession is not "outlandish." *See Craig v. Singletary*, 127 F.3d 1030, 1044–45

(11th Cir. 1997) (collecting cases). *See also Daniels v. Bango*, 487 F. App'x 532

(11th Cir. 2012). But once Plaintiff had been interviewed and Heard recanted his

identification, the analysis changes.

After Plaintiff's interrogation and Heard's recantation, Lt. Howard had no

basis to believe there was probable cause. He should have returned to the

magistrate, and stated the following: (1) the witness who identified Ms.

Washington after seeing a photograph saw her in person and stated that she was not

present at the crime; (2) Ms. Washington professed her innocence and provided the

names of numerous alibi witnesses, and has been forthcoming in terms of

complying with my investigation, supplied her cell phone for examination and

submitted to a DNA test; (3) nothing Ms. Washington said was incriminating; and

(4) the only other basis to believe Ms. Washington had any involvement was an

anonymous statement from a confidential informant that Ms. Washington "was

involved" but which provided no other detail. Based on these facts, there was no

probable cause.

These points are elaborated in turn.

### a.    Lt. Howard had a clearly established duty to re-assess probable cause in light of subsequently obtained exculpatory evidence

It is clearly established that an officer must release a person from arrest if he receives information that dissipates previously established probable cause. *See United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) ("A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated."); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("The continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause."); *United States v. Edwards*, 632 F.3d 633, 640 (10th Cir. 2001) (holding that "[i]f the police learn information that destroys their probable cause to arrest a defendant, the arrest may become illegal") (citing *United States v. Watson*, 423 U.S. 411, 449 (1976) (Marshall, J., dissenting) ("[P]robable cause to arrest, once formed, will continue to exist for the indefinite future, at least if no intervening exculpatory facts come to light.")); *Bigford v. Taylor* 834 F.2d 1213, 1218 (5th Cir. 1988) ("As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause."). The Ninth Circuit recently denied qualified immunity on the basis of this "well-established" authority where the detention of suspects for

14

five hours after the discovery of facts dissipating probable cause was a "violat[ion]

of [their] clearly established Fourth Amendment rights." *Nicholson v. City of Los

Angeles*, 935 F.3d 685, 691 (9th Cir. 2019).

The Eleventh Circuit has squarely held that continuation of a criminal

prosecution after probable cause has dissipated violates the Fourth Amendment.

*Kjellsen v. Mills*, 517 F.3d 1232, 1238 (11th Cir. 2008) ("[p]robable cause is

required to continue a prosecution, not just to arrest a defendant or to institute a

prosecution."); *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003) ("[A] criminal

prosecution . . . continued . . . without probable cause" can be a malicious

prosecution.); *Dunn v. Norrington*, No. 1:08-CV-2217-JEC, 2010 WL 11527349, at

*8 (N.D. Ga. Mar. 29, 2010), *aff'd*, 411 F. App'x 279 (11th Cir. 2011) (affirming

district court's denial of summary judgment for defendant where there was

probable cause to arrest plaintiff initially but officers lacked probable cause for

plaintiff's subsequent detention after viewing video surveillance tape a few days

after the arrest confirming that plaintiff was at a different location at the time of the

crime, which "greatly diminished" or "altogether destroyed . . . any ground for

believing that plaintiff was guilty"). Officers are not entitled to qualified immunity

where their failure to act on exculpatory information causes prolonged detention.

15

*See Lyttle v. United States*, 867 F. Supp. 2d 1256, 1288 (M.D. Ga. 2012) (citing *Cannon v. Macon Cty.*, 1 F.3d 1558, 1563 (11th Cir. 1993) (denying qualified immunity to ICE officer where "continued unlawful detention" of Plaintiff after learning facts suggesting he was a U.S. citizen violated clearly established Fourth Amendment rights).

Here, it appears that Lt. Howard took the idea of an "investigative hold" literally. He testified that an "investigative hold" means that a person can be held, without communication to the outside world, for a period of 72 hours, and that after 72 hours, the subject of the hold must be released. *See* Def. SMF ¶¶ 32–34 (citing Howard Dep. 49:1–6, 57:8–12, 80:4–24). There is no such type of hold. No reasonable officer could believe they can detain a suspect even after the evidence that justified the original arrest was negated.

    **b.**    **Lt. Howard did not have arguable probable cause to detain Plaintiff following her interrogation and Heard's in-person recantation**

The next question is whether Howard had arguable probable cause to continue to detain Plaintiff after her interview and Heard's recantation. *See Bailey v. Swindell*, 940 F.3d 1295, 1296 n.5 (11th Cir. 2019) (clarifying that the qualified

immunity analysis in Fourth Amendment asks whether there was "arguable probable cause").

### 1.    *The confidential informant's statement had scant probative value*

Tips may contribute to a probable cause determination, but in assigning probative weight to such tips, courts must assess the totality of the circumstances surrounding them, including the tips' reliability. *See Cozzi v. City of Birmingham*, 892 F.3d 1288, 1295 (11th Cir. 2018). In *Cozzi*, the court held that the probative value of an anonymous tip that the plaintiff "resembled" the perpetrator of a robbery was low, given the circumstances surrounding the tip. The circumstances here also show an extremely low probative value of the tip that Plaintiff might have been "involved" in the crime. There was no other information that supporting a belief that the confidential informant had any personal knowledge, or what was meant by Plaintiff being "involved." Lt. Howard asked no follow up questions whatsoever. Alone, the tip amounted to nothing more than a reason to interview Plaintiff.

### 2. **Heard's in-person denial that Ms. Washington was involved in the crime negated probable cause**

Although Plaintiff acknowledges that Heard's initial identification gave rise to arguable probable cause, the evidence was not strong. During that interrogation, which followed from a partial confession, Heard sought to minimize his own involvement, and mumbled his way through a disjointed story. Upon obtaining the identification, Lt. Howard sought a warrant immediately and without follow up questions.

No one saved the photograph that Howard showed to Heard, and no one has testified to its contents. This should not weigh against Plaintiff. Howard had a responsibility to preserve this evidence because it was directly relevant to the fact that he charged Heard with making false statements. If it was a blurry photo, or did not fairly represent Plaintiff, or looked like one of the other perpetrators, then it would undermine the claim that Heard lied when he initially identified Plaintiff. In spite of it being relevant to that prosecution, which did not conclude until July 18, 2019, the lead detective on the case failed to preserve the evidence.[10] Thus,

---

[10] *See* Meriwether Clerk of Court Online Docket, http://www.meriwetherclerkofcourt.com/WebCaseManagement/mainpage.aspx (last visited November 6, 2019) (the criminal case number for all four prosecutions is 2017-cr-0555).

construing the evidence for the purposes of summary judgment, in light of the lost

evidence and duty to preserve the evidence, the Court should assume anything

beyond what is obvious: an in-person identification was objectively more reliable

than the photo-identification.

### 3. *The unreasonableness of Lt. Howard's probable cause assessment is further demonstrated by his failure to investigate evidence that would have established Plaintiff's innocence*

The Eleventh Circuit has repeatedly held that qualified immunity is not

available to officers who make arrests without probable cause after electing "not to

obtain easily discoverable facts" or "unreasonably disregard[ing]" exculpatory

evidence. *Cozzi*, 892 F.3d at 1295. *See also Kingsland v. City of Miami*, 382 F.3d

1220, 1228 (11th Cir. 2004) (an officer may not "turn[ ] a blind eye to immediately

available exculpatory information"). When an officer raises a qualified immunity

defense the court "must charge him with possession of all the information

reasonably discoverable by an officer acting reasonable under the circumstances."

*Cozzi*, at 1295 (citing *Sevigny v. Dicksey*, 846 F.2d 953, 955 (4th Cir. 1988)). For

example, the court denied immunity where an officer arrested a robbery suspect on

the basis of one anonymous and one informant tip linking the suspect to crime

scene surveillance video of a robbery. During the arrest, the suspect's roommate

19

told the officer that the suspect had only one tattoo where the video clearly

indicated multiple tattoos on the perpetrator. The Court held that the officer lacked

arguable probable cause for the arrest because his failure to further investigate this

discrepancy was "unreasonable." *Cozzi* at 1295. *See also Kingsland* at 1228

(finding that information that could be uncovered by searching a truck for drugs

and interviewing available witnesses constituted "easily discoverable facts");

*Howard v. Gee*, 538 F. App'x 884 (11th Cir. 2013) (deputy not entitled to qualified

immunity because fact question exists whether he conducted a reasonable

investigation before charging the plaintiff with battery); *Daniels v. Bango*, 487 F.

App'x 532, 537 (11th Cir. 2012) (holding the Fourth Amendment requires officers

to employ additional investigative techniques where a reasonable officer would

harbor "serious doubts" about the identity of a suspect). This duty to conduct a

reasonable investigation has been recognized by a number of other Circuits as well.

*See Bigford*, 834 F.2d at 1215-1216 (stating that where "[m]inimal further

investigation . . . would have reduced any suspicion created by the facts the police

had discovered[,]" probable cause is lacking.); *Merriman*, 856 F.2d at 1334 (noting

that officers never interviewed the alleged victim); *Ortiz-Hernandez*, 427 F.3d at

575 (noting that the police failed to get a body cavity search order to confirm their

suspicion that the defendant had swallowed balloons containing heroin). Here, Plaintiff provided Howard with five alibi witnesses, offered, a DNA test, gave her phone's password, and the only evidence connecting her to the crime had been refuted.

## III.    CONCLUSION

The central disputed fact in this case is whether, after seeing Plaintiff in person, told Lt. Howard "that's the b****" or said "that's not her." If he said the latter, then Lt. Howard had a duty to release Plaintiff. If he said the former, then there was probable cause for her continued detention. A jury must decide.[11]


**Jennifer Hickey**
Georgia Bar No. 440019

LAW OFFICE OF JENNIFER HICKEY, LLC
1310 Rockbridge Rd SW Ste G2
Stone Mountain, GA 30087
770-674-8252
jennifer@jenniferhickeylaw.com

**Jeffrey R. Filipovits**
Georgia Bar No. 825553

FILIPOVITS LAW, PC
2900 Chamblee-Tucker Road
Building 1
Atlanta, GA 30341
678-237-9302
jeff@law.filipovits.com

---

[11] Defendants have also moved for summary judgment on Plaintiff's claims for attorney's fees under 42 U.S.C. § 1988. This claim is obviously derivative of Plaintiff's § 1983 claim and rises or falls with that claim.

21

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record: Taylor Hensel and Timothy Buckley.


This 6th day of November, 2019.

> **Jeffrey R. Filipovits**
> Georgia Bar No. 825553
> FILIPOVITS LAW, PC
> 2900 Chamblee-Tucker Road, Bldg. 1
> Atlanta, Georgia 30341
> 678.237.9302
> jeff@law.filipovits.com