UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VIVIANNE JADE WASHINGTON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>INVESTIGATOR JASON DURAND, )<br>in his individual capacity, )<br>INVESTIGATOR HUGH HOWARD, )<br>in his individual capacity, )<br>)<br>Defendants. ) | Case No.:<br><br>3:18-cv-86-TCB |

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Lt. Howard and Sgt. Durand were assigned to investigate a home invasion where an elderly woman, Ms. Dorothy Dow, had been assaulted and set on fire. *See* Howard Dep. 13:8–18.

2. After the attack, Ms. Dow was able to describe her assailants as "several black males and an African American female." Ms. Dow owned a blue berry farm, and paid contractors to pick blueberries. Howard Dep. 24:18–21.

3. The weekend after the attack, during an intense investigation, Lt. Howard received a phone call stating that they "needed to look at" Cortavious Heard and

1

Justin Grady, both of whom were sometimes employed at Ms. Dow's blueberry farm. Howard Dep. 26:8–16.

4.     The information presented to Lt. Howard was only that he "needed to look at" these two individuals. Howard Dep. 28:11–20.

5.     Howard initially interviewed Grady, who stated that he did not want to speak with police. Howard Dep. 30:3–22.

6.     At that point, Grady was free to go. Howard Dep. 32:9–19.

7.     Howard next interviewed Heard, who appeared at the Sheriff's Office for a voluntary interview. Howard Dep. 35:15–25.

8.     During his interview, Heard denied involvement in the home invasion. See generally Heard Int. #1.

9.     During the interview, Lt. Howard noticed that it appeared Heard had blood stains on his shoes, and took the shoes for testing. Heard Int. #1 at 13:30.

10.    Next, because Heard was on probation, and had executed a Fourth Amendment waiver as a condition of that probation, Lt. Howard stated that he needed Heard's phone and to search Heard's residence. *See* Heard Inv. Notes, Doc. 54-3 at 9.

11. When searching Heard's residence, officers found items belonging to Ms. Dow, and Heard confessed that he had been present at a home invasion. Id. They also found marijuana. He was then arrested for possession of marijuana, and taken back to the Sheriff's Office for a custodial interview. Howard Dep. 27:2–25.

12. During Heard's interrogation, Heard signed a Fifth Amendment waiver and spoke with Lt. Howard. Heard Int. #2 c. 2:55.

13. Heard identified Justin Grady as being involved in the home invasion. *Id.*

14. Heard's statement is difficult to understand on video. See Heard Int. #2 c. 4:00.

15. Heard stated that there was a planned burglary and that, on the way there, he and Grady dropped off his girlfriend. Id. He presented a story which minimized his involvement, and painted Grady as the primary actor. *Id.* c. 7:15.

16. During Heard's interrogation, Officer McPhie of the City of Newnan police department sent a photo to Lt. Chris Warden of the Meriwether Sheriff's Office. Howard Dep. 41:17–25.

17. McPhie told Warden that McPhie "heard she [the subject of the photo] was involved in this" and provided the name "Vivianne Washington." Howard Dep. 41:22–23.[1]

18. In spite of receiving numerous tips which were irrelevant, see Howard Dep. 39:4–22,2 Lt. Howard did not attempt to communicate with Ofc. McPhie about the photograph or the information provided by his confidential informant. Howard Dep. 42:7–11.

19. At that point, Lt. Howard only that an unnamed confidential informant had stated that Plaintiff "was involved." Howard Dep. 42:12–18.

20. Lt. Howard then returned to the interview showed the photograph to Heard. Heard stated that the person in the photograph was the same as one of the other people who participated in the home invasion. He stated that she was wearing the same hat (which was a plain black hat). Heard Int. #2 c. 11:00.

21. After the positive identification, Howard learned that the subject of the photo was Vivianne Washington. Based on the identification and the anonymous confidential informant statement, Defendants obtained an arrest warrant for Ms. Washington. Howard Dep. 48:7–13.

22. Durand was responsible for obtaining the warrant for Ms. Washington. Howard Dep. 58:14–18.

23. The warrant affidavit was conclusory on its face. See Doc. 54-3 at 1. It merely recited the elements of the offense. *Id.*

24. Neither Howard nor Durand know what information Durand might have communicated to the magistrate judge beyond that which was included in the warrant. *See* Howard Dep. 60:17–19; Durand Dep. 26:15–19.

25. There is no record of the testimony presented to the magistrate, but the face of the warrant indicates that it was based on "sufficient causes made known to me in the above affidavit . . . ." Doc. 54-3 at 1.

26. Plaintiff was arrested at 4:45 p.m. on August 8, 2016. See Ex. 1, Arrest Report, at 9.

27. After Plaintiff's arrest, she initially stated that she wanted to speak with a lawyer after expressing confusion about what was happening and why she had been arrested. *See generally* Washington Int. #1. *Id.* at 1:00.

28. Lt. Howard then terminated the interview, and Plaintiff was taken to a segregation cell in the jail. Howard Dep. 81:7–11.

29. Later, Plaintiff sent a note through the jailer stating that she wished to speak with Lt. Howard. Id. Ms. Washington then signed a Fifth Amendment waiver, and Howard proceeded with an interrogation. Ms. Washington told Howard that, at the time of the crime, she was home with her mother, and there were other people at her home as well. Washington Int. #2 at 18:00.

30. Lt. Howard immediately began by giving Plaintiff a story to follow. He asked: did you drive your vehicle down to Forest Grove on February 9th and, told Plaintiff that only "whether you went into that house or not, is up for debate." Washington Int. #2 at 18:42.

31. Plaintiff then stated that she had never been to Meriwether County. Washington Int. #2 at 18:42. When shown a photo of the other suspects, she said she never heard of "these people" (meaning the alleged perpetrators), before. Washington Int. #2 at 18:05.

32. Plaintiff then asked, hopefully, whether the victim of the crime could identify the perpetrators. Washington Int. #2 at 18:55.

33. Lt. Howard then falsely stated that three people, who had been interviewed separately, had identified Plaintiff as being present at the crime. Washington Int. #2 at 19:02.

34. Lt. Howard then told her that they would be getting fingerprints and DNA. Plaintiff expressed hope at this prospect. Id. Howard said that such tests could take up to 6 months, to which Plaintiff responded, in apparent disbelief, "So I am supposed to be in here for 6 months?"Washington Int. #2 at 19:39.

35. Howard stated that it was "quite possible and maybe longer." *Id.*

36. Lt. Howard then told Ms. Washington that there was an "over abundance of information" that she was "at least" at the scene of the crime. Washington Int. #2 at 20:01.

37. He then falsely stated, again, that there were three separate people who looked at line ups and identified her. Washington Int. #2 at 20:15.

38. Howard then mentioned that the officers were going to ping Ms. Washington's phone, so that they would know where she was at the time of the crime. Washington Int. #2 at 20:30.

39. Ms. Washington was again hopeful, and asked if that shows that she was not in Meriwether County at all—but Howard interrupted and stated that too could be evidence of guilt, since a lot of people think they can leave their phones at home and get away with a crime. Washington Int. #2 at 20:53.

40. Howard then stated that, even if her phone proved to be evidence of innocence, there were still three people who identified her. Washington Int. #2 at 20:58.

41. Lt. Howard then stated that he knew that Ms. Washington traded shifts with someone, and that she worked until about 10:00 p.m. Washington Int. #2 at 21:22.

42. Ms. Washington then stated that after she left work, she returned home, took a shower, and was hanging out with her girlfriend. Washington Int. #2 at 21:31.

43. She stated she walked to the park with her girlfriend and returned. Washington Int. #2 at 21:57.

44. Howard then said he was going to wait for the DNA evidence to come back. Washington Int. #2 at 22:58.

45. Ms. Washington willfully supplied the password to her cell phone to Howard. Washington Int. #2 at 30:42.

46. Lt. Howard had Plaintiff's cell phone and could easily have accessed it. Washington Dep. 37:12–21.

47. Ultimately, after the interview, Howard had no evidence connecting Ms. Washington to the crime aside from Heard's identification and the statement from Officer McPhie's confidential informant. Howard Dep. 48:14–17.

48. Howard did not learn any incrimination information from Ms. Washington during her interrogation. Howard Dep. 48:14–21, 56:13–15.

49. During the interrogation, Ms. Washington provided her girlfriend's name, and the names of other friends that she called. She also said that her mother,

brother, niece, and nephew were at her house the evening of the crime, and that she was getting ready to go to a festival the next day. Washington Int. #2 at 35:02.

50. Ms. Washington also willingly submitted to a DNA swab. Washington Int. #2 at 48:25.

51. Plaintiff was not allowed to make any phone calls or have any contact with her family (who could have exonerated her) because of an "investigative hold" which meant that Plaintiff could not have any contact with anyone outside the jail for a period of 72 hours. Howard Dep. 49:1–6, 57:8–12, 80:4–24.

52. Ms. Washington stated that she had never seen the other suspects when Lt. Howard presented photographs to her. Washington Int. #2 at 23:53, 25:36 (Howard stating "we've got three people you say you never met, all gotta do is confirm that one of them knows you and it's over").

53. Plaintiff also proposed that, if the people who identified her gave a description of her clothing, officers could go to her home and get them to have her clothing tested. Washington Int. #2 at 25:13.

54. After the interview, Howard intentionally walked Ms. Washington past Heard's cell to give him the opportunity to identify her. Howard Dep. 47:21–48:6, 48:22–49:6.

55. Heard saw Ms. Washington and stated "that's not her." Washington Dep. 29:2–10.4

56. Plaintiff continued to remain incarcerated after Heard retracted his identification, and was ultimately released the next day. She spent a total of 25 hours in the jail. Washington Dep. 43:12–22.

Submitted this 6th day of November, 2019.

| | |
|---|---|
| **Jennifer Hickey** | **Jeffrey R. Filipovits** |
| Georgia Bar No. 440019 | Georgia Bar No. 825553 |
| | |
| LAW OFFICE OF JENNIFER HICKEY, LLC | FILIPOVITS LAW, PC |
| 1310 Rockbridge Rd SW Ste G2 | 2900 Chamblee-Tucker Road |
| Stone Mountain, GA 30087 | Building 1 |
| 770-674-8252 | Atlanta, GA 30341 |
| jennifer@jenniferhickeylaw.com | 678-237-9302 |
| | jeff@law.filipovits.com |