IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VIVIANNE JADE WASHINGTON,<br><br>    Plaintiff,<br><br>v.<br><br>HUGH HOWARD, in his individual capacity,<br><br>    Defendant. | CIVIL ACTION FILE<br><br>NO. 3:18-cv-86-TCB |

## **O R D E R**

This case comes before the Court on the motion [54] for summary judgment filed by Defendant Hugh Howard.[1]

## I.  Background

Taken in the light most favorable to Plaintiff Vivienne Jade Washington, the facts are as follows. On August 4, 2016, a home invasion occurred in which the proprietor of a local blueberry farm,

---

[1] Howard filed this motion jointly with his co-Defendant Jason Durand. However, the claims against Durand were voluntarily dismissed [61] on March 11, 2020.

Dorothy Dow, was set on fire. Although Ms. Dow later died from her injuries, she was able to identify her attackers shortly before her death as "several black males and an African American female." [51] at 24:18-21.

Sgt. Jason Durand was assigned to investigate the crime. He contacted Lt. Hugh Howard with instructions to apply for a search warrant of the residence where the invasion occurred. Magistrate Judge Shirlene Lowery issued the search warrant.

While searching the crime scene, Howard received a phone call from a former farm employee who told Howard that he should interview Cortavious Heard. Heard was another former farm employee who was currently on probation.

Howard contacted Heard; he initially denied any knowledge of the crime. Upon conducting a search of his residence, however, his probation officer discovered both marijuana and certain items owned by Dow. He subsequently confessed to the home invasion, was arrested, and was taken to the police station to be questioned further.

Around the same time, narcotics officer Victor McPhie alerted the sheriff's office that he had received information from a confidential source about the crime. The confidential source informed McPhie that Plaintiff Washington was involved in the crime and gave him a photograph of her.

At the station, Howard interviewed Heard and showed him the photograph of Washington. According to Heard, the individual in the photograph was wearing the same black hat as the individual who helped him commit the Dow crime. Heard then positively identified the woman in the photograph as having participated in the Dow crime with him.

Based on (1) the positive identification by Heard, and (2) the information from McPhie's confidential source that Washington was involved, Durand sought an arrest warrant for Washington. He presented the warrant to Judge Lowery, who signed it based on

Durand's oral testimony.² At 4:45 p.m. on August 8, 2016, Washington was arrested.

At 6:33 p.m., Washington was booked on an investigative hold, during which time she was not allowed phone calls, visitors, or interactions with other detainees. Investigative holds are limited to seventy-two hours.

Less than an hour later, Howard interviewed Washington for the first time. During this interview, she was shown pictures of Heard and others.³ She told Howard that she did not know Heard but admitted to knowing the other individuals believed to be involved.⁴ The interview was terminated after she requested to speak with a lawyer.

---

² The fact that Durand testified orally before the warrant was executed is consistent with general practice in Meriwether County, where arrest warrant applications are attested to orally before a magistrate judge. The magistrate judge then decides whether to issue the warrant based on the officer's testimony.

³ Although Washington argues in her response to Howard's motion for summary judgment that she was not shown pictures of Heard during her first interview, she testified under oath to this fact during her deposition. *See* [52] at 31:5–7 ("The first time [Howard] showed me – I think it was Heard – it was a [sic] older gentleman and someone else. And it was like pictures.").

⁴ Although Washington argues in her response to Howard's motion that she never admitted to knowing these individuals, her sworn testimony during her deposition indicates otherwise. *See* [52] at 32:13–16 ("I think I had said something like, you know, I was related to them or something like that. I don't know. Not

4

A few minutes later, Washington expressed interest in speaking with Howard again. She swears that during this second interview she told him that she had lied during the first interview about knowing any individuals implicated in the Dow crime and denied all involvement.

After Washington's second interview, she was walked past Heard, who was being held in an observation cell with glass windows. Washington testified that she saw Justin Grady in the cell with Heard, although it is undisputed that Heard was housed in the observation cell alone. Upon seeing her, Heard stated "that's not her."[5]

Because her story changed during the two interviews, Washington was driven to LaGrange, Georgia for a polygraph test. By 9:17 p.m. that night, she was signing the requisite documents to take the test.

During the polygraph test, Washington was asked "Were you in that house last Thursday night?" and "Were you present when that

---

related but like, you know, like I knew something or . . . ."); *see also* [52] at 32: 17–19 ("You said you knew them when you were shown the pictures? Yeah.").

[5] In his deposition, Howard testifies that Heard said "that is her. That is the bitch that I told you about." [51] at 47:9–10. However, at this stage of the litigation, all facts and conflicts in the evidence are viewed in the light most favorable to Washington.

woman was beaten and burnt?" The test reported "physiological responses indicative of deception." [54-3] at 17. Afterwards, Washington confessed to being involved in the Dow crime.

After confessing, Washington then began making up additional details about the Dow crime. Because her version of the facts was inconsistent with the other evidence gathered as part of the investigation, Howard deduced that Washington was lying to him about her involvement.

Howard then interviewed Heard again. Heard retracted his positive identification of Washington and passed a polygraph test in which he stated that she was not involved. After Heard passed the polygraph, Washington was released. She spent a total of 25 hours in jail.

On August 7, 2018, Washington brought this 42 U.S.C. § 1983 action and related state-law claims against Durand and Howard in their individual capacities. After Defendants moved for summary judgment on all claims, Washington voluntarily dismissed all her

claims against Durand and her state-law claims against Howard. She now proceeds solely on her § 1983 claim against Howard.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). there is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Inv'r Grp. V. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to

7

satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex Corp.*, 477 U.S. at 331). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

If the moving party satisfies its burden by either method, the burden shifts back to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must "'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 324).

### III. Discussion

Section 1983 creates no substantive rights. *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Rather, it provides a vehicle through

which an individual may seek redress when his federally protected rights have been violated by an individual acting under color of state law. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).

Here, Washington claims that Howard deprived her of her Fourth Amendment right to be free from unreasonable seizures when he continued to detain her after uncovering sufficient exculpatory evidence such that probable cause for her arrest did not exist.

In response, Howard contends that he is entitled to qualified immunity, which "offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"To claim qualified immunity, a defendant must first show he was performing a discretionary function." *Barnes v. Zaccari*, 669 F.3d 1295, 1302–03 (11th Cir. 2012) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005)). "Once discretionary authority is

9

established, "[t]he burden then shifts to the plaintiff to show that: (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time of the violation." *Id.* at 1303; *see also Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)).

Here, it is undisputed that Howard was acting within the scope of his discretionary authority. Accordingly, the burden shifts to Washington to show that Howard violated a clearly established constitutional right.

In the Eleventh Circuit, it is clearly established that "an arrest without probable cause violates the right to be free from an unreasonable search under the Fourth Amendment." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003) (citing *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)).

If, however, the arrest was based on probable cause, it cannot form the basis of a § 1983 claim for malicious prosecution. *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (citing *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)). "Probable cause to

arrest exists 'when an arrest is objectively reasonable based on the totality of the circumstances.'" *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).

Notably, "[e]ven without actual probable cause . . . a police officer is entitled to qualified immunity if he had only 'arguable' probable cause to arrest." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (quoting *Ferraro*, 284 F.3d at 1195). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [defendant] could have believed that probable cause existed to arrest." *Id.* (quoting *Redd*, 140 F.3d at 1383–84).

Howard contends that there was at least arguable probable cause to support Washington's arrest based on the confidential source's information about her and Heard's positive identification. Washington agrees. *See* [57] at 12 ("Given Heard's positive identification of Plaintiff's photograph, Plaintiff recognizes there was at least arguable probable cause for Plaintiff's initial arrest.").

11

However, Washington argues that Howard remains liable for malicious prosecution because arguable probable cause dispelled after (1) Heard stated, "that's not her" when she was walked past his observation cell; (2) she reneged on her confession; and (3) Heard recanted his positive identification of her.

It is true in the Eleventh Circuit that "[p]robable cause is required to *continue* a prosecution, not just to arrest a defendant or to institute a prosecution." *Kjellsen v. Mills*, 517 F.3d 1232, 1238 (11th Cir. 2008) (citing *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)). "[A] criminal prosecution . . . continued . . . without probable cause" can give rise to a claim for malicious prosecution. *Wood*, 323 F.3d at 882.

A determination as to when—or if—probable cause dissipates is a fact-intensive, totality-of-the-circumstances inquiry. The discovery of information that clearly exculpates the arrestee may suffice. *See Kjellsen*, 517 F.3d at 1238 (citing *Kinzer v. Jackson*, 316 F.3d 139, 143–44 (2d Cir. 2003) ("A malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant")). This is especially true if

there is evidence that an officer acted with malice in concealing the exculpatory evidence. *See id.* (citing *Sanders v. English*, 950 F.2d 1152, 1163 (5th Cir. 1992) ("Deliberately concealing or deliberately failing to disclose exculpatory evidence . . . can . . . form the basis for an inference that a defendant police officer acted with malice in initiating and maintaining a prosecution")).

However, officers are only required to "investigate objectively and consider all information available to them at the time." *Kingsland*, 382 F.3d at 1229; *see also Rankin v. Evans*, 133 F.3d 1425, 1435–36 (11th Cir. 1998) (concluding that "the statements made by [the plaintiff] after his arrest did not defeat the existence of probable cause or necessitate immediate further investigation" because an officer "need not 'investigate independently every claim of innocence'") (quoting *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989)); *Marx*, 905 F.2d at 1506 (noting that probable cause is "judged not with clinical detachment but with a common sense view to the realities of normal life").

Here, Washington urges that arguable probable cause dissipated when she reneged on her earlier confession and Heard subsequently

13

stated "that's not her" when she was walked past him. She argues that at that point, there was sufficient exculpatory information such that Howard's arguable probable cause for detaining her was extinguished.

However, by the time Washington was walked past Heard, she had already confessed to knowing other suspected co-conspirators involved in the Dow crime. And the information from the confidential informant identified her as a potential co-conspirator. Certainly, this is a far cry from circumstances in which exculpatory evidence clearly and immediately established the detainee's innocence. *Cf. Dunn v. Norrington,* No. 1:08-cv-2217-jec, 2010 WL 11527349, at *8 (N.D. Ga. Mar. 29, 2010) (finding that the dissipation of probable cause gave rise to a malicious prosecution claim where a video was uncovered that plainly exonerated the detainee, but the officer did not inform the district attorney or the court about the evidence); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (finding that a malicious prosecution claim may lie where an officer continues to pursue a defendant's case after the "groundless nature of the charges" became "apparent").

Moreover, because arguable probable cause is all that is required, it is immaterial that Howard was mistaken in relying on the information from the confidential source and Washington's false confession. *See Banks v. Bostic*, No. 17–13986, 2018 WL 1158306, at *2 (11th Cir. Jan. 10, 2018) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity") (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). Instead, Howard need only act reasonably in continuing the investigation.

The Court concludes that Howard did so. The record shows that after Washington changed her story in her second interview, Howard arranged for her to take a polygraph test. After she confessed following the test, Howard continued his investigation by asking her questions related to her involvement. When she could not support her story with facts consistent with other evidence of the crime, Howard interviewed Heard again. And once Heard recanted his positive identification, it is undisputed that Washington was immediately released.

This is a far cry from an officer who "made little attempt to investigate the incident," accepting one party's statement while ignoring another's and speaking with no identified witnesses. *Howard v. Gee*, 538 F. App'x 884, 890 (11th Cir. 2013). Accordingly, Howard acted in an objectively reasonable manner, and at least arguable probable cause existed until Heard recanted his positive identification of Washington after his polygraph.

Thus, Washington cannot show that Howard violated her constitutional rights under the Fourth Amendment. As a result, the Court need not consider whether that right was 'clearly established' on the date of the alleged violation.

## IV. Conclusion

Because the facts do not show that Howard violated the Fourth Amendment, he is entitled to qualified immunity. Accordingly, his motion [54] for summary judgment is granted. The Clerk is directed to close this case.

IT IS SO ORDERED this 7th day of May, 2020.

_____
Timothy C. Batten, Sr.
United States District Judge